IN THE SUPREME COURT OF NORTH CAROLINA

No. 372A14

Filed 23 July 2015

ALICE HART, RODNEY ELLIS, JUDY CHAMBERS, JOHN HARDING LUCAS, MARGARET ARBUCKLE, LINDA MOZELL, YAMILE NAZAR, ARNETTA BEVERLY, JULIE PEEPLES, W.T. BROWN, SARA PILAND, DONNA MANSFIELD, GEORGE LOUCKS, WANDA KINDELL, VALERIE JOHNSON, MICHAEL WARD, T. ANTHONY SPEARMAN, BRITTANY WILLIAMS, RAEANN RIVERA, ALLEN THOMAS, JIM EDMONDS, SASHA VRTUNSKI, PRISCILLA NDIAYE, DON LOCKE, and SANDRA BYRD,
    Plaintiffs

   v.

STATE OF NORTH CAROLINA and NORTH CAROLINA STATE EDUCATION ASSISTANCE AUTHORITY,
    Defendants,

   and

CYNTHIA PERRY, GENNELL CURRY, TIM MOORE, and PHIL BERGER,
    Intervenor-Defendants


Appeal pursuant to N.C.G.S. § 7A-27(b)(1) from an order and final judgment granting summary judgment and injunctive relief for plaintiffs entered on 28 August 2014 by Judge Robert H. Hobgood in Superior Court, Wake County. On 10 October 2014, pursuant to N.C.G.S. § 7A-31(a) and (b)(2), and Rule 15(e)(2) of the North Carolina Rules of Appellate Procedure, the Supreme Court on its own initiative certified the case for review prior to determination in the Court of Appeals. Heard in the Supreme Court on 24 February 2015.

> *Patterson Harkavy LLP, by Burton Craige, Narendra K. Ghosh, and Paul E. Smith; and North Carolina Justice Center, by Carlene McNulty and Christine Bischoff, for plaintiff-appellees.*

*Roy Cooper, Attorney General, by Lauren M. Clemmons, Special Deputy Attorney General, for defendant-appellants.*
*Institute for Justice, by Richard D. Komer, pro hac vice, Robert Gall, and Renée Flaherty, pro hac vice; and Shanahan Law Group, PLLC, by John E. Branch, III, for parent intervenor-defendant-appellants Cynthia Perry and Gennell Curry.*

*Nelson Mullins Riley & Scarborough, LLP, by Noah H. Huffstetler III and Stephen D. Martin, for legislative officer intervenor-defendant-appellants Tim Moore and Phil Berger.*

*American Civil Liberties Union of North Carolina Legal Foundation, by Christopher Brook, for Americans United for Separation of Church and State, American Civil Liberties Union, American Civil Liberties Union of North Carolina Legal Foundation, Anti-Defamation League, Baptist Joint Committee for Religious Liberty, and Interfaith Alliance Foundation, amici curiae.*

*Liberty, Life, and Law Foundation, by Deborah J. Dewart; Thomas C. Berg, pro hac vice, University of St. Thomas School of Law (Minnesota); and Christian Legal Society, by Kimberlee Wood Colby, pro hac vice, for Christian Legal Society; North Carolina Christian School Association; Roman Catholic Diocese of Charlotte, North Carolina; Roman Catholic Diocese of Raleigh, North Carolina; North Carolina Family Policy Council; Liberty, Life, and Law Foundation; Association of Christian Schools International; American Association of Christian Schools; and National Association of Evangelicals, amici curiae.*

*Jane R. Wettach for Education Scholars and Duke Children's Law Clinic, amici curiae.*

*Tin Fulton Walker & Owen, by Luke Largess; and National Education Association, by Philip Hostak, pro hac vice, for National Education Association, amicus curiae.*

*UNC Center for Civil Rights, by Mark Dorosin, Managing Attorney, and Elizabeth Haddix, Senior Staff Attorney, for North Carolina Conference of the National Association for the Advancement of Colored People, amicus curiae.*

*Robinson, Bradshaw & Hinson, P.A., by Richard A. Vinroot and Matthew F. Tilley, for Pacific Legal Foundation, amicus curiae.*

MARTIN, Chief Justice.

When assessing a challenge to the constitutionality of legislation, this Court's duty is to determine whether the General Assembly has complied with the constitution. If constitutional requirements are met, the wisdom of the legislation is a question for the General Assembly. *E.g.*, *In re Hous. Bonds*, 307 N.C. 52, 57, 296 S.E.2d 281, 284 (1982). In performing our task, we begin with a presumption that the laws duly enacted by the General Assembly are valid. *Baker v. Martin*, 330 N.C. 331, 334, 410 S.E.2d 887, 889 (1991). North Carolina courts have the authority and responsibility to declare a law unconstitutional,[1] but only when the violation is plain and clear. *State ex rel. Martin v. Preston*, 325 N.C. 438, 449, 385 S.E.2d 473, 478 (1989). Stated differently, a law will be declared invalid only if its unconstitutionality is demonstrated beyond reasonable doubt. *Baker*, 330 N.C. at 334-35, 410 S.E.2d at 889.

In this case plaintiffs challenge the Opportunity Scholarship Program, which allows a small number of students[2] in lower-income families to receive scholarships from the State to attend private school. According to the most recent figures published by the Department of Public Instruction, a large percentage of economically

---

[1] *See* N.C. Const. art. IV, § 1; *Bayard v. Singleton*, 1 N.C. 5 (1787) (recognizing the courts' power of judicial review and declaring unconstitutional an act of the legislature infringing upon the right to a trial by jury).

disadvantaged students in North Carolina are not grade level proficient with respect to the subjects tested on the State's end-of-year assessments.[3]  Disagreement exists as to the innovations and reforms necessary to address this and other educational issues in our state.  Our state and country benefit from the debate between those with differing viewpoints in this quintessentially political dialogue.  Such discussions inform the legislative process.  But the role of judges is distinguishable, as we neither participate in this dialogue nor assess the wisdom of legislation.  Just as the legislative and executive branches of government are expected to operate within their constitutionally defined spheres, so must the courts.  *See In re Alamance Cty. Court Facils.*, 329 N.C. 84, 94, 405 S.E.2d 125, 130 (1991) ("Just as the inherent power of the judiciary is plenary within its branch, it is curtailed by the constitutional definition of the judicial branch and the other branches of government.").[4]  Our constitutionally assigned role is limited to a determination of whether the legislation

---

[2] In the first year of the Opportunity Scholarship Program, 2300 students were selected to participate.  The average daily membership in our State's public and charter schools is approximately 1.5 million students.  N.C. Dep't of Pub. Instruction, *Facts and Figures 2012-13*, http://www.dpi.state.nc.us/docs/fbs/resources/data/factsfigures/2012-13figures.pdf (last visited July 21, 2015) (reporting a combined average daily membership of 1,492,793 in public and charter schools during calendar year 2012-13).

[3] N.C. Dep't of Pub. Instruction, *2013-14 School Report Cards*, NC School Report Cards, http://www.ncpublicschools.org/src/ (last visited July 21, 2015).

[4] This foundational principle of constitutional law is well established in North Carolina.  *See* N.C. Const. art I, § 6 ("The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other."); *see also id.* art. II (describing the legislative sphere of authority); *id.* art. III (describing the executive sphere of authority); *id.* art. IV (describing the judicial sphere of authority).

is plainly and clearly prohibited by the constitution. Because no prohibition in the constitution or in our precedent forecloses the General Assembly's enactment of the challenged legislation here, the trial court's order declaring the legislation unconstitutional is reversed.

\* \* \*

## I

Under the provisions of the Opportunity Scholarship Program,[5] the State Educational Assistance Authority (the Authority) makes applications available each year "to eligible students for the award of scholarship grants to attend any nonpublic school." N.C.G.S. § 115C-562.2(a) (2014). An "[e]ligible student" is defined as "a student who has not yet received a high school diploma" and who, in addition to meeting other specified criteria, "[r]esides in a household with an income level not in excess of one hundred thirty-three percent (133%) of the amount required for the student to qualify for the federal free or reduced-price lunch program." *Id.* § 115C-

---

[5] The Opportunity Scholarship Program was ratified by the General Assembly and signed into law by the Governor in July 2013 as part of the "Current Operations and Capital Improvements Appropriations Act of 2013"—the State's budget bill for fiscal years 2013-14 and 2014-15. Current Operations and Capital Improvements Appropriations Act of 2013, ch. 360, sec. 8.29, 2013 N.C. Sess. Laws 995, 1064-69. The program was amended in August of 2014 to its present form, The Current Operations and Capital Improvements Appropriations Act of 2014, ch. 100, sec. 8.25, 2013 N.C. Sess. Laws (Reg. Sess. 2014) 328, 371-73, and is codified as amended in Part 2A to Article 39 of Chapter 115C of the General Statutes, N.C.G.S. §§ 115C-562.1 through -562.7 (2013 & Supp. 2014).

562.1(3) (2013). A "[n]onpublic school" is any school that meets the requirements of either Part 1 ("Private Church Schools and Schools of Religious Charter") or Part 2 ("Qualified Nonpublic Schools") of Article 39 of Chapter 115C of the General Statutes. *Id.* § 115C-562.1(5) (2013).

The Authority awards scholarships to the program's applicants, with preference given first to previous scholarship recipients, and then to students in lower-income families and students entering kindergarten or the first grade. *Id.* § 115C-562.2(a). Subject to certain restrictions, students selected to participate in the program may receive a scholarship grant of up to $4,200 to attend any nonpublic school. *Id.* § 115C-562.2(b) (2014). Once a student has been selected for the program and has chosen a school to attend, the Authority remits the grant funds to the nonpublic school for endorsement, and the parent or guardian "restrictively endorse[s] the scholarship grant funds awarded to the eligible student to the nonpublic school for deposit into the account of [that] school." *Id.* § 115C-562.6 (2013).

A nonpublic school that accepts a scholarship recipient for admission must comply with the requirements of N.C.G.S. § 115C-562.5(a), which include: (1) providing the Authority with documentation of the tuition and fees charged to the student; (2) providing the Authority with a criminal background check conducted on the highest ranking staff member at the school; (3) providing the parent or guardian of the student with an annual progress report, including standardized test scores;

(4) administering at least one nationally standardized test or equivalent measure for each student in grades three or higher that measures achievement in the areas of English grammar, reading, spelling, and mathematics; (5) providing the Authority with graduation rates of scholarship program students; and (6) contracting with a certified public accountant to perform a financial review for each school year in which the nonpublic school accepts more than $300,000 in scholarship grants. *Id.* § 115C-562.5(a)(1)-(6) (2014). Nonpublic schools enrolling more than twenty-five Opportunity Scholarship Program students must report the aggregate standardized test performance of the scholarship students to the Authority. *Id.* § 115C-562.5(c) (2014). Furthermore, all nonpublic schools that accept scholarship program students are prohibited from charging additional fees based on a student's status as a scholarship recipient, *id.* § 115C-562.5(b) (2014), and from discriminating with respect to the student's race, color, or national origin, *id.* § 115C-562.5(c1) (2014); *see also* 42 U.S.C. § 2000d (2012). Nonpublic schools that fail to comply with these statutory requirements are ineligible to participate in the program. N.C.G.S. § 115C-562.5(d) (2014).

The Opportunity Scholarship Program also subjects the Authority to certain reporting requirements. Each year, the Authority must provide demographic information and program data to the Joint Legislative Education Oversight Committee. *Id.* § 115C-562.7(b) (2014). The Authority is also required to select an independent research organization to prepare an annual report on "[l]earning gains

or losses of students receiving scholarship grants" and on the "[c]ompetitive effects on public school performance on standardized tests as a result of the scholarship grant program." *Id.* § 115C-562.7(c) (2014). Following submission of these reports to the Joint Legislative Education Oversight Committee and the Department of Public Instruction, "[t]he Joint Legislative Education Oversight Committee shall review [the] reports from the Authority and shall make ongoing recommendations to the General Assembly as needed regarding improving administration and accountability for nonpublic schools accepting students receiving scholarship grants." *Id.*

The Opportunity Scholarship Program is funded by appropriations from general revenues to the Board of Governors of the University of North Carolina, which provides administrative support for the Authority. In fiscal year 2014-15, the General Assembly appropriated a total of $10,800,000 to the program.

## II

On 11 December 2013, plaintiff Alice Hart and twenty-four other taxpayers filed a complaint in Superior Court, Wake County, challenging the constitutionality of the Opportunity Scholarship Program under the Constitution of North Carolina.[6]

---

[6] Although plaintiffs generally represent a cross section of individuals who currently interact or have previously interacted with our state's public schools, plaintiffs' complaint in the present action was made in their capacity as taxpayers of the state.

Plaintiffs' amended complaint asserted five claims for relief, all of which presented facial challenges under the North Carolina Constitution. First, plaintiffs alleged that the Opportunity Scholarship Program "appropriates revenue paid by North Carolina taxpayers to private schools for primary and secondary education" in violation of Article IX, Sections 2(1) and 6, and Article I, Section 15. Second, plaintiffs alleged that the law "appropriates revenue paid by North Carolina taxpayers to private schools for the ostensible purpose of primary and secondary education without those funds being supervised by the Board of Education" in violation of Article IX, Section 5. Third, plaintiffs alleged that the law creates "a non-uniform system of schools for primary and secondary education" in violation of Article IX, Section 2(1). Fourth, plaintiffs alleged that in "transfer[ring] revenue paid by North Carolina taxpayers to private schools without any accountability or requirements ensuring that students will actually receive an education," the law "does not accomplish any public purpose" in violation of Article V, Sections 2(1) and 2(7). Fifth, plaintiffs alleged that in "transfer[ring] revenue paid by North Carolina taxpayers to private schools that are permitted to discriminate against students and applicants on the basis of race, color, religion, or national origin,"[7] the law serves no public purpose and therefore violates Article V, Section 2(1), and Article I, Section 19. Plaintiffs

---

[7] Plaintiffs' allegations concerning a nonpublic school's ability to discriminate based on race, color, or national origin were rendered moot by the passage of N.C.G.S. § 115C-562.5(c1). *See* ch. 100, sec. 8.25(d), 2013 N.C. Sess. Laws (Reg. Sess. 2014) at 371.

requested a declaration that the scholarship program is unconstitutional under the challenged provisions, as well as a permanent injunction to prevent implementation and enforcement of the legislation.

On cross-motions for summary judgment, the trial court entered an order and final judgment on 28 August 2014, allowing plaintiffs' motion for summary judgment on all claims, denying defendants' and intervenor-defendants' motions for summary judgment,[8] and declaring the Opportunity Scholarship Program unconstitutional on its face. The trial court permanently enjoined implementation of the Opportunity Scholarship Program legislation, including the disbursement of public funds.

Defendants appealed, and this Court, on its own initiative, certified the appeal for immediate review prior to a determination in the Court of Appeals.[9] For the following reasons, we reverse the trial court's order and final judgment declaring the Opportunity Scholarship Program unconstitutional and dissolve the injunction preventing further implementation and enforcement of the challenged legislation.

---

[8] For purposes of this opinion, we will refer to defendants and intervenor-defendants collectively as "defendants."

[9] We also certified the companion case of *Richardson v. State*, No. 384A14, for immediate review, which we decide today in a separate opinion.

## III

Defendants' appeal from the trial court's order and final judgment presents questions to this Court concerning the construction and interpretation of provisions in the North Carolina Constitution.[10]  As the court of last resort in this state, we answer with finality "issues concerning the proper construction and application of North Carolina laws and the Constitution of North Carolina." *Preston*, 325 N.C. at 449, 385 S.E.2d at 479 (citations omitted).  Accordingly, our review of the constitutional questions presented is de novo. *Piedmont Triad Reg'l Water Auth. v. Sumner Hills Inc.*, 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001); *see Craig v. New Hanover Cty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009).

In exercising our de novo review, we apply well-settled principles to assess the constitutionality of legislative acts.  At the outset, the North Carolina Constitution is not a grant of power, but a limit on the otherwise plenary police power of the State. *See, e.g.*, *Preston*, 325 N.C. at 448-49, 385 S.E.2d at 478.  We therefore presume that a statute is constitutional, and we will not declare it invalid unless its unconstitutionality is demonstrated beyond reasonable doubt. *Baker*, 330 N.C. at 334-35, 410 S.E.2d at 889; *see also Preston*, 325 N.C. at 449, 385 S.E.2d at 478 (stating that an act of the General Assembly will be declared unconstitutional only when "it [is] plainly and clearly the case" (quoting *Glenn v. Bd. of Educ.*, 210 N.C. 525, 529-30,

---

[10] Plaintiffs have not presented any claims under the United States Constitution.

187 S.E. 781, 784 (1936))). Next, when the constitutionality of a legislative act depends on the existence or nonexistence of certain facts or circumstances, we will presume the existence or nonexistence of such facts or circumstances, if reasonable, to give validity to the statute. *In re Hous. Bonds*, 307 N.C. at 59, 296 S.E.2d at 285 (citing *Martin v. N.C. Hous. Corp.*, 277 N.C. 29, 44, 175 S.E.2d 665, 673 (1970)). Further, a facial challenge to the constitutionality of an act, as plaintiffs have presented here, is the most difficult challenge to mount successfully. *Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009) (citations omitted). "We seldom uphold facial challenges because it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them." *Id.* (citation omitted); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51, 128 S. Ct. 1184, 1191 (2008) (discussing why facial challenges are disfavored). Accordingly, we require the party making the facial challenge to meet the high bar of showing "that there are no circumstances under which the statute might be constitutional." *Beaufort Cty. Bd. of Educ.*, 363 N.C. at 502, 681 S.E.2d at 280 (citation omitted); *see also United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987) ("[T]he challenger must establish that no set of circumstances exists under which the [a]ct would be valid. The fact that the [act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid . . . ."). It is through this lens of constitutional review that we begin our analysis in this case.

## A

The first question presented by defendants' appeal is whether Article IX, Section 6 of the state constitution prohibits the General Assembly from appropriating tax revenues to the Opportunity Scholarship Program, which is not part of our public school system.

Defendants contend that Article IX, Section 6 should not be read as a limitation on the State's ability to spend on education generally. In plaintiffs' view, however, even when the General Assembly explicitly intends, as it did here, to appropriate money for educational scholarships to nonpublic schools, the plain text of Article IX, Section 6 prohibits that option and requires that any and all funds for education be appropriated exclusively for our public school system.

Entitled "State school fund," Article IX, Section 6 provides:

> The proceeds of all lands that have been or hereafter may be granted by the United States to this State, and not otherwise appropriated by this State or the United States; all moneys, stocks, bonds, and other property belonging to the State for purposes of public education; the net proceeds of all sales of the swamp lands belonging to the State; and all other grants, gifts, and devises that have been or hereafter may be made to the State, and not otherwise appropriated by the State or by the terms of the grant, gift, or devise, shall be paid into the State Treasury and, together with so much of the revenue of the State as may be set apart for that purpose, shall be faithfully

> appropriated and used exclusively for establishing and maintaining a uniform system of free public schools.

N.C. Const. art. IX, § 6.

The manifest purpose of this section is to protect the "State school fund" in order to preserve and support the public school system, not to limit the State's ability to spend on education generally. Section 6 accomplishes this purpose by identifying sources of funding for the State school fund and mandating that funds derived by the State from these sources be "faithfully appropriated for establishing and maintaining in this State a system of free public schools." *City of Greensboro v. Hodgin*, 106 N.C. 182, 186-87, 11 S.E. 586, 587-88 (1890) (quoting a previous version of the provision). The first four clauses of Section 6 identify non-revenue sources of funding, two of which appear to be mandatory and two of which appear to be within the discretion of the General Assembly to otherwise appropriate as it sees fit. The fifth clause (the revenue clause) states that a portion of the State's revenue "may be set apart for that purpose"—meaning for the purpose of "establishing and maintaining a uniform system of free public schools." This clause recognizes that the General Assembly may choose to designate a portion of the State's general tax revenue as an additional source of funding for the State school fund.

Thus, within constitutional limits, the General Assembly determines how much of the revenue of the State will be appropriated for the purpose of "establishing and maintaining a uniform system of free public schools." Insofar as the General

-14-

Assembly appropriates a portion of the State's general revenues for the public schools, Section 6 mandates that those funds be faithfully used for that purpose. Article IX, Section 6 does not, however, prohibit the General Assembly from appropriating general revenue to support other educational initiatives. *See Preston*, 325 N.C. at 448-49, 385 S.E.2d at 478 ("All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." (citations omitted)). Because the Opportunity Scholarship Program was funded from general revenues, not from sources of funding that Section 6 reserves for our public schools, plaintiffs are not entitled to relief under this provision.

Faithful appropriation and use of educational funds was a very real concern to the framers of our constitution. Before the introduction of Article IX, Section 6 in the 1868 Constitution, the Literary Fund, which was devoted to funding public education, was routinely threatened to be used during the Civil War to pay for other expenses and was almost completely depleted by the war's end. *See* M.C.S. Noble, *A History of the Public Schools of North Carolina* 242-49, 272 (1930); Milton Ready, *The Tar Heel State: A History of North Carolina* 263 (2005). The framers of the 1868 Constitution sought to constitutionalize the State's obligation to protect the State school fund. In so doing, our framers chose not to limit the State from appropriating general revenue to fund alternative educational initiatives. Plaintiffs' arguments to the contrary are without merit.

Given our disposition of plaintiffs' claim under Article IX, Section 6, we agree with defendants that plaintiffs are likewise not entitled to relief under Article IX, Section 5. Under Article IX, Section 5, "[t]he State Board of Education shall supervise and administer the free public school system *and the educational funds provided for its support*." N.C. Const. art. IX, § 5 (emphasis added). Because public funds may be spent on educational initiatives outside of the uniform system of free public schools, plaintiffs' contention that funding for the Opportunity Scholarship Program should have gone to the public schools—and therefore been brought under the supervision and administration of the State Board of Education—is without merit.

The final issue under Article IX presented by defendants' appeal is whether the Opportunity Scholarship Program legislation violates Article IX, Section 2(1). Under Section 2(1), "[t]he General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students." *Id.* art. IX, § 2(1). Plaintiffs contend that "[i]f the uniformity clause has any substance, it means that the State cannot create an alternate system of publicly funded private schools standing apart from the system of free public schools mandated by the Constitution."

Plaintiffs' characterization of the Opportunity Scholarship Program is inaccurate. The Opportunity Scholarship Program legislation does not create "an

alternate system of publicly funded private schools." Rather, this legislation provides modest scholarships to lower-income students for use at nonpublic schools of their choice. Furthermore, we have previously stated that the uniformity clause requires that provision be made for public schools of like kind throughout the state. *Wake Cares, Inc. v. Wake Cty. Bd. of Educ.*, 363 N.C. 165, 171-72, 675 S.E.2d 345, 350 (2009). The uniformity clause applies exclusively to the public school system and does not prohibit the General Assembly from funding educational initiatives outside of that system. Accordingly, the Opportunity Scholarship Program does not violate Article IX, Section 2(1).

**B**

The next question presented by defendants' appeal is whether the appropriation of general revenues to fund educational scholarships for lower-income students is for a public purpose under Article V, Sections 2(1) and 2(7).

Defendants contend that providing lower-income students the opportunity to attend private school "satisfies the State's legitimate objective of encouraging the education of its citizens." Defendants maintain that, in satisfying this objective, appropriations directed to the Opportunity Scholarship Program are made for a public purpose. Plaintiffs contend that the program does not accomplish a public purpose because the program appropriates taxpayer money for educational

scholarships to private schools without regard to whether the schools satisfy substantive education standards.

Under Article V, Section 2(1), "[t]he power of taxation shall be exercised in a just and equitable manner, for public purposes only, and shall never be surrendered, suspended, or contracted away." N.C. Const. art. V, § 2(1). Under Article V, Section 2(7), "[t]he General Assembly may enact laws whereby the State, any county, city or town, and any other public corporation may contract with and appropriate money to any person, association, or corporation for the accomplishment of public purposes only." *Id.* art. V, § 2(7). Because "[t]he power to appropriate money *from* the public treasury is no greater than the power to levy the tax which put the money in the treasury," we subject both legislative powers to the public purpose requirement. *Mitchell v. N.C. Indus. Dev. Fin. Auth.*, 273 N.C. 137, 143, 159 S.E.2d 745, 749-50 (1968).

At the outset, we note that "the fundamental concept underlying the public purpose doctrine" is that "the ultimate gain must be the public's, not that of an individual or private entity." *Maready v. City of Winston-Salem*, 342 N.C. 708, 719, 467 S.E.2d 615, 622 (1996). Thus, in resolving challenges to legislative appropriations under the public purpose clause, this Court's inquiry is discrete—we ask whether the legislative purpose behind the appropriation is public or private. *See id.* at 716, 467 S.E.2d at 620-21; *Mitchell*, 273 N.C. at 144, 159 S.E.2d at 750. If the

purpose is public, then the wisdom, expediency, or necessity of the appropriation is a legislative decision, not a judicial decision. *See Maready*, 342 N.C. at 714, 467 S.E.2d at 619. Accordingly, our public purpose analysis does not turn on whether the appropriation will, in the words of plaintiffs, "accomplish" a public purpose.

Likewise, sustaining a legislative appropriation under the public purpose clause does not require a concurrent assessment of whether other constitutional infirmities exist that might render the legislation unconstitutional. If the challenged appropriation is constitutionally infirm on other grounds, proper redress is under the applicable constitutional provisions, not the public purpose clause. Thus, plaintiffs' contentions that the Opportunity Scholarship Program runs afoul of Article I, Sections 15 and 19, due to scholarships being remitted to allegedly "unaccountable" schools or schools that discriminate on the basis of religion, are inapposite to the public purpose analysis.[11]

Our inquiry under Article V, Sections 2(1) and 2(7), therefore, is whether the appropriations made by the General Assembly to fund the Opportunity Scholarship Program are for a public rather than private purpose. In addressing this question, we are mindful of the general proposition articulated by this Court over forty-five years ago: "Unquestionably, the education of residents of this State is a recognized

---

[11] The independent applicability of Article I, Sections 15 and 19, in this case is discussed in Part III(C) of our opinion.

object of State government.  Hence, the provision therefor is for a public purpose." *State Educ. Assistance Auth. v. Bank of Statesville*, 276 N.C. 576, 587, 174 S.E.2d 551, 559 (1970) (citing *Jamison v. City of Charlotte*, 239 N.C. 682, 696, 80 S.E.2d 904, 914 (1954); *Green v. Kitchin*, 229 N.C. 450, 455, 50 S.E.2d 545, 549 (1948)).

In determining whether a specific appropriation is for a public purpose, "[t]he term 'public purpose' is not to be narrowly construed."  *Madison Cablevision, Inc. v. City of Morganton*, 325 N.C. 634, 646, 386 S.E.2d 200, 207 (1989) (citing *Briggs v. City of Raleigh*, 195 N.C. 223, 226, 141 S.E. 597, 599 (1928)).  We have also specifically "declined to 'confine public purpose by judicial definition[, leaving] "each case to be determined by its own peculiar circumstances as from time to time it arises." ' " *Maready*, 342 N.C. at 716, 467 S.E.2d at 620 (alteration in original) (quoting *Stanley v. Dep't of Conservation & Dev.*, 284 N.C. 15, 33, 199 S.E.2d 641, 653 (1973)).  Indeed, "[a] slide-rule definition to determine public purpose for all time cannot be formulated; the concept expands with the population, economy, scientific knowledge, and changing conditions."  *Id.* (quoting *Mitchell*, 273 N.C. at 144, 159 S.E.2d at 750).  Although the initial determination of the General Assembly in passing the law is given "great weight" by this Court, *Madison Cablevision*, 325 N.C. at 644-45, 386 S.E.2d at 206, "the ultimate responsibility for the public purpose determination rests, of course, with this Court," *id.* at 645, 386 S.E.2d at 206.  "[T]wo guiding principles have been established for determining that a particular undertaking by [the State] is for a public purpose:  (1) it involves a reasonable connection with the convenience and

necessity of the [State]; and (2) the activity benefits the public generally, as opposed to special interests or persons." *Maready*, 342 N.C. at 722, 467 S.E.2d at 624 (quoting *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207 (citations omitted)).

"As to the first prong, whether an activity is within the appropriate scope of governmental involvement and is reasonably related to communal needs may be evaluated by determining how similar the activity is to others which this Court has held to be within the permissible realm of governmental action." *Id.*; *see also Green v. Kitchin*, 229 N.C. 450, 455, 50 S.E.2d 545, 549 (1948) ("A tax or an appropriation is certainly for a public purpose if it is for the support of government, or for any of the recognized objects of government." (citations omitted)). Here, the provision of monetary assistance to lower-income families so that their children have additional educational opportunities is well within the scope of permissible governmental action and is intimately related to the needs of our state's citizenry. *See State Educ. Assistance Auth.*, 276 N.C. at 587, 174 S.E.2d at 559 ("Unquestionably, the education of residents of this State is a recognized object of State government."); *see also Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 10, 418 S.E.2d 648, 655 (1992) ("Education is a governmental function so fundamental in this state that our constitution contains a separate article entitled 'Education.' "); *Delconte v. State*, 313 N.C. 384, 401-02, 329 S.E.2d 636, 647 (1985) ("We also recognize that the state has a compelling interest in seeing that children are educated and may, constitutionally, establish minimum educational requirements and standards for this education.").

In *State Education Assistance Authority v. Bank of Statesville*, for example, we approved the use of revenue bond proceeds to "make loans to meritorious North Carolinians of slender means" for the purpose of "minimiz[ing] the number of qualified persons whose education or training is interrupted or abandoned for lack of funds." 276 N.C. at 587, 174 S.E.2d at 559. Observing that "[t]he people of North Carolina constitute our State's greatest resource," we held that "bond proceeds are used for *a public purpose* when used to make such loans." *Id.*

Similarly, in *Hughey v. Cloninger* we addressed the legality of an appropriation made by the Gaston County Board of Commissioners to a private school for dyslexic children. 297 N.C. 86, 88, 95, 253 S.E.2d 898, 900, 903 (1979). Although we held that the Board of Commissioners lacked statutory authority to make such an appropriation, we stated, albeit in obiter dictum, that had there been statutory authority, such an appropriation "would have presented no 'public purpose' difficulties as it is well established that both appropriations and expenditures of public funds for the education of the citizens of North Carolina are for a public purpose." *Id.* at 95, 253 S.E.2d at 903-04. We therefore conclude that the appropriations made to the Opportunity Scholarship Program involve a "reasonable connection with the convenience and necessity of the [State]." *Maready*, 342 N.C. at 722, 467 S.E.2d at 624 (quoting *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207).

As to the second prong of the public purpose inquiry, whether "the activity benefits the public generally, as opposed to special interests or persons," *id.* (quoting *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207), "[i]t is not necessary, in order that a use may be regarded as public, that it should be for the use and benefit of every citizen in the community," *id.* at 724, 467 S.E.2d at 625 (quoting *Briggs*, 195 N.C. at 226, 141 S.E. at 599-600). "[A]n expenditure does not lose its public purpose merely because it involves a private actor. Generally, if an act will promote the welfare of a state or a local government and its citizens, it is for a public purpose." *Id.*; *see also State Educ. Assistance Auth.*, 276 N.C. at 588, 174 S.E.2d at 560 ("[T]he fact that the individual obtains a private benefit cannot be considered sufficient ground to defeat the execution of 'a paramount public purpose.'" (quoting *Clayton v. Kervick*, 52 N.J. 138, 155, 244 A.2d 281, 290 (1968))).

The promotion of education generally, and educational opportunity in particular, is of paramount public importance to our state. Indeed, borrowing language from the Northwest Ordinance of 1787, our constitution preserves the ethic of educational opportunity, declaring that "[r]eligion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and *the means of education* shall forever be encouraged." N.C. Const. art. IX, § 1 (emphasis added). Although the scholarships at issue here are available only to families of modest means, and therefore inure to the benefit of the eligible students in the first instance, and to the designated nonpublic schools in the second, the

ultimate beneficiary of providing these children additional educational opportunities is our collective citizenry. *Cf. Maready*, 342 N.C. at 724, 467 S.E.2d at 625 (recognizing that an expenditure providing an "incidental private benefit" is for a public purpose if it serves "a primary public goal"). Accordingly, the appropriations made by the General Assembly for the Opportunity Scholarship Program were for a public purpose under Article V, Sections 2(1) and 2(7).

## C

The next issue presented by defendants' appeal concerns the independent applicability, if any, of Article I, Section 15 to plaintiffs' claims. Article I, Section 15 declares: "The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15. This constitutional provision states a general proposition concerning the right to the privilege of education, the substance of which is detailed in Article IX. Article I, Section 15 is not an independent restriction on the State. *See generally* John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 62-63 (2d ed. 2013).

Plaintiffs rely on Article I, Section 15 and *Leandro v. State,* 346 N.C. 336, 488 S.E.2d 249 (1997), a case challenging the adequacy of public school funding, for the proposition that "public funds spent for education must go to institutions that will provide meaningful educational services—specifically, to institutions with a sufficient curriculum and competent teachers." Because the Opportunity Scholarship

Program legislation does not require that participating nonpublic schools meet the sound basic education standard announced in *Leandro*, 346 N.C. at 347, 488 S.E.2d at 255, or impose regulatory standards approximating those placed on our public schools in Chapter 115C of the General Statutes, plaintiffs contend that the scholarship program accomplishes no public purpose and is constitutionally inadequate.[12]

As stated above, Article I, Section 15 has no effect on our disposition with respect to plaintiffs' public purpose claim. In its order and final judgment, however, the trial court purported to grant independent relief to plaintiffs under Article I, Section 15, concluding that the Opportunity Scholarship Program legislation fails to " 'guard and maintain' the right of the people to the privilege of education" by "appropriating taxpayer funds to educational institutions that are not required to meet educational standards" and by "expending public funds so that children can attend private schools." To the extent that plaintiffs rely on Article I, Section 15 as

---

[12] Plaintiffs acknowledge that at least some nonpublic schools may be able to provide scholarship students a meaningful education. Even so, plaintiffs contend that "[t]he State has an affirmative obligation to ensure that public funds are used to accomplish a public purpose" and that, without built-in accountability standards, the State cannot ensure that the Opportunity Scholarship Program will accomplish its intended purposes as to each scholarship recipient. In making this argument, plaintiffs would require the State to demonstrate that the program operates constitutionally in all circumstances, rather than accepting the burden of showing that there is no set of circumstances under which the law could operate in a constitutional manner.

an independent basis of relief, we agree with defendants that such reliance is misplaced.

It is axiomatic that the responsibility *Leandro* places on the State to deliver a sound basic education has no applicability outside of the education delivered in our public schools. In *Leandro* we stated that a public school education that "does not serve the purpose of preparing students to participate and compete in the society in which they live and work is devoid of substance and is constitutionally inadequate." 346 N.C. at 345, 488 S.E.2d at 254. We concluded that "Article I, Section 15 *and* Article IX, Section 2 of the North Carolina Constitution combine to guarantee every child of this state an opportunity to receive a sound basic education *in our public schools*." *Id.* at 347, 488 S.E.2d at 255 (emphases added). Thus, *Leandro* does not stand for the proposition that Article I, Section 15 independently restricts the State outside of the public school context.

Furthermore, our constitution specifically envisions that children in our state may be educated by means outside of the public school system. *See* N.C. Const. art. IX, § 3 ("The General Assembly shall provide that every child of appropriate age and of sufficient mental and physical ability shall attend the public schools, *unless educated by other means*." (emphasis added)); *see also Delconte*, 313 N.C. at 385, 400-01, 329 S.E.2d at 638, 646-47 (concluding that home school instruction did not violate compulsory attendance statutes and noting that a contrary holding would raise a

serious constitutional question under the North Carolina Constitution). Thus, even if Article I, Section 15 could serve as an independent basis of relief, there is no merit in the argument that a legislative program designed to increase educational opportunity in our state is one that fails to "guard and maintain" the "right to the privilege of education."

The final issue presented by defendants' appeal concerns plaintiffs' Article I, Section 19 religious discrimination claim. Article I, Section 19 declares, in pertinent part, "[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, *religion*, or national origin." N.C. Const. art. I, § 19 (emphasis added). Plaintiffs couch their religious discrimination claim, both for justiciability purposes and with respect to the merits of the claim, in terms of the public purpose doctrine. In short, plaintiffs contend that the Opportunity Scholarship Program accomplishes no public purpose because it allows funding for educational scholarships to schools that may discriminate on the basis of religion. Again, our analysis of the public purpose doctrine made clear that Article I, Section 19, like Article I, Section 15, has no effect on our disposition with respect to plaintiffs' public purpose claim.

With respect to the independent applicability of Article I, Section 19 as a stand-alone claim, defendants have maintained throughout this litigation that such a claim is not justiciable in this case because plaintiffs, as taxpayers of the state, lack

standing. Specifically, defendants contend that plaintiffs have suffered no injury in fact because they are not in the class of persons against which the program allegedly discriminates. We agree and therefore hold that plaintiffs' Article I, Section 19 claim must be dismissed.

Generally, "a taxpayer has standing to bring an action against appropriate government officials for the alleged misuse or misappropriation of public funds." *Goldston v. State*, 361 N.C. 26, 33, 637 S.E.2d 876, 881 (2006). Yet, "[a] taxpayer, as such, does not have standing to attack the constitutionality of any and all legislation." *Nicholson v. State Educ. Assistance Auth.*, 275 N.C. 439, 447, 168 S.E.2d 401, 406 (1969) (citations omitted). "[A] person who is seeking to raise the question as to the validity of a discriminatory statute has no standing for that purpose unless he belongs to the class which is prejudiced by the statute." *In re Martin*, 286 N.C. 66, 75, 209 S.E.2d 766, 773 (1974) (quoting 16 Am. Jur. 2d *Constitutional Law* § 123 (1964)). Here plaintiffs are taxpayers of the state, not eligible students alleged to have suffered religious discrimination as a result of the admission or educational practices of a nonpublic school participating in the Opportunity Scholarship Program. Because eligible students are capable of raising an Article I, Section 19 discrimination claim on their own behalf should the circumstances warrant such action, plaintiffs have no standing to assert a direct discrimination claim on the students' behalf.

## IV

"The General Assembly has the right to experiment with new modes of dealing with old evils, except as prevented by the Constitution." *Redev. Comm'n v. Sec. Nat'l Bank of Greensboro*, 252 N.C. 595, 612, 114 S.E.2d 688, 700 (1960); *see also New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S. Ct. 371, 386-87 (1932) (Brandeis & Stone, JJ., dissenting) (indicating that an individual state may serve as a laboratory of democracy and experiment with new legislation in order to meet changing social and economic needs). In this case the General Assembly seeks to improve the educational outcomes of children in lower-income families. The mode selected by the General Assembly to effectuate this policy objective is the Opportunity Scholarship Program.

When, as here, the challenged legislation comports with the constitution, the wisdom of the enactment is a decision for the General Assembly. As this Court has previously recognized, "[i]t may be that the measure may prove eventually to be a disappointment, and is ill advised, but the wisdom of the enactment is a legislative and not a judicial question." *Sec. Nat'l Bank of Greensboro*, 252 N.C. at 612, 114 S.E.2d at 700. To the extent that plaintiffs disagree with the General Assembly's educational policy decision as expressed in the Opportunity Scholarship Program, their remedy is with the legislature, not the courts. Our review is limited to a determination of whether plaintiffs have demonstrated that the program legislation

plainly and clearly violates our constitution. Plaintiffs have made no such showing in this case. Accordingly, the trial court erred in declaring the Opportunity Scholarship Program unconstitutional. We therefore reverse the trial court's order and final judgment.

REVERSED.


Justice HUDSON dissenting.


Because the Opportunity Scholarship Program provides for the spending of taxpayer money on private schools without incorporating any standards for determining whether students receive a sound basic—or indeed, any—education, I conclude that the program violates the North Carolina Constitution in two respects. As a result, I must respectfully dissent.

First, the Opportunity Scholarship Program (also known as the "voucher program") violates the requirements of Article V, Sections 2(1) and 2(7) that public funds be spent for public purposes only. "The power of taxation shall be exercised in a just and equitable manner, for public purposes only, and shall never be surrendered, suspended, or contracted away." N.C. Const. art. V, § 2(1). Additionally, "[t]he General Assembly may enact laws whereby the State, any county, city or town,

and any other public corporation may contract with and appropriate money to any person, association, or corporation for the accomplishment of public purposes only." *Id.* § 2(7). Second, in so doing, the spending authorized under the voucher program also violates Article I, Section 15, which states: "The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." *Id.* art. I, § 15.

In its order the trial court includes the following among the "Undisputed Material Facts":

> 4. Private schools that receive scholarship funds are (1) not required to be accredited by the State Board of Education or any other state or national institution; (2) not required to employ teachers or principals who are licensed or have any particular credentials, degrees, experience, or expertise in education; (3) not subject to any requirements regarding the curriculum that they teach; (4) not required to provide a minimum amount of instructional time; and (5) not prohibited from discriminating against applicants or students on the basis of religion. *See* N.C. Gen. Stat. § 115C-562.1 *et seq.*
>
> . . . .
>
> 6. Of the 5,556 scholarship applicants, 3,804 applicants identified 446 private schools they planned to attend. Of those 446 schools, 322 are religious schools and 117 are independent schools. Of the 322 religious schools scholarship recipients planned to attend, 128 are accredited by some organization and 194 are not accredited by any organization. Of the 117 independent schools scholarship recipients planned to attend, 58 are accredited by some organization and 59 are not accredited by any organization.

The trial court then reached the following conclusions of law, among others:

> 3.      The Court concludes from the record beyond a reasonable doubt that the [Opportunity Scholarship Program] Legislation funds private schools with taxpayer dollars as an alternative to the public school system in direct contravention of Article [I], Section[ ]  15 . . . and Article V, Sections 2(1) and (7) of the North Carolina Constitution.  The legislation unconstitutionally
>
> > . . . .
>
> > b.      appropriates public funds for education in a manner that does not accomplish a public purpose, in violation of Article V, Sections 2(1) and (7), in particular by appropriating funds to private primary and secondary schools without regard to whether these schools satisfy substantive educational standards:  appropriating taxpayer funds to unaccountable schools does not accomplish a public purpose;
>
> > . . . .
>
> > e.      fails to "guard and maintain" the right of the people to the privilege of education in violation of Article I, Section 15 by appropriating taxpayer funds to educational institutions that are not required to meet educational standards, including curriculum and requirements that teachers and principals be certified[.]
>
> > . . . .
>
> 4.      The General Assembly fails the children of North Carolina when they are sent with taxpayer money to private schools that have no legal obligation to teach them anything.

As noted above, these facts are undisputed, and in my view, these conclusions are correct.

In *Madison Cablevision, Inc. v. City of Morganton* this Court articulated a two-part test for determining if a spending statute complies with the requirements of the North Carolina Constitution as found in Article V, Section 2(1), which is quoted above and known as the "public purpose" clause. 325 N.C. 634, 646, 386 S.E.2d 200, 207 (1989). As noted by the majority, while "[t]he initial responsibility for determining what is and what is not a public purpose rests with the legislature" and "its determinations are entitled to great weight," "the ultimate responsibility for the public purpose determination rests, of course, with this Court." *Id.* at 644-45, 386 S.E.2d at 206 (internal citations omitted). Further, in *Stanley v. Department of Conservation and Development* this Court articulated the following principle regarding public purpose expenditures: "In determining what is a public purpose the courts look not only to the ends sought to be attained but also 'to the means to be used.'" 284 N.C. 15, 34, 199 S.E.2d 641, 653 (1973) (citations omitted), *abrogated in part on other grounds by Madison Cablevision*, 325 N.C. at 647-48, 386 S.E.2d at 208, *and superseded by constitutional amendment*, N.C. Const. art V, §§ 2(7), 9. Therefore, I conclude that the majority's assertion that "our public purpose analysis does not turn on whether the appropriation will . . . 'accomplish' a public purpose" is contrary to our precedent. It is precisely this determination that we are called upon to undertake here. To that end, this Court has articulated "[t]wo guiding principles" for

determining whether an expenditure of tax funds is for a public purpose. *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207 (citations omitted) (involving operation of a public enterprise by a municipality). A governmental expenditure satisfies the public purpose clause if: "(1) it involves a reasonable connection with the convenience and necessity of the particular [jurisdiction], and (2) the activity benefits the public generally, as opposed to special interests or persons." *Id.*

Defendants assert, and I agree with the majority, that our courts have long held that education generally serves a public purpose. *See, e.g.*, *State Educ. Assistance Auth. v. Bank of Statesville*, 276 N.C. 576, 587, 174 S.E.2d 551, 559 (1970) ("Unquestionably, the education of residents of this State is a recognized object of State government. Hence, provision therefor is for a public purpose." (citations omitted)). I further agree with the majority that, in principle, "the provision of monetary assistance to lower-income families so that their children have greater educational opportunities is well within the scope of permissible governmental action and is intimately related to the needs of our state's citizenry."

Nonetheless, I cannot agree that the spending of taxpayer funds on private school education through the Opportunity Scholarship Program here serves "public purposes only" as our constitution requires. N.C. Const. art. V, § 2(1). In *Leandro v. State* this Court concluded that "the right to education provided in the state constitution is a right to a sound basic education. An education that does not serve the purpose of preparing students to participate and compete in the society in which

they live and work is devoid of substance and is constitutionally inadequate." 346 N.C. 336, 345, 488 S.E.2d 249, 254 (1997). We went on to say in *Hoke County Board of Education v. State* that a sound basic education should include an "effective instructional program" taught by "competent, certified, well-trained" teachers and led by "well-trained competent" principals. 358 N.C. 605, 636, 599 S.E.2d 365, 389 (2004). Admittedly, this is the standard we have set for our public schools, not our private ones, and it is conceivable that we would set a less comprehensive substantive standard for private schools. However, a large gap opens between *Leandro*-required standards and no standards at all, which is what we have here. When taxpayer money is used, the total absence of standards cannot be constitutional.

Before the legislature created the Opportunity Scholarship Program, taxpayer money had not been used to directly finance any part of a private school education. The expenditure of public taxpayer funds brings the Opportunity Scholarship Program squarely within the requirements of Article V, Sections 2(1) and 2(7). As the trial court noted, the schools that may receive Opportunity Scholarship Program money have no required teacher training or credentials and no required curriculum or other means of measuring whether the education received by students at these schools prepares them "to participate and compete in the society in which they live and work." *Leandro*, 346 N.C. at 345, 488 S.E.2d at 254. As we have observed in *State Education Assistance Authority v. Bank of Statesville*, "[t]he people of North Carolina constitute our State's greatest resource." 276 N.C. at 587, 174 S.E.2d at

559. Educating our citizens plants the seeds for their participation, and when we are able to reap the rewards of having an educated citizenry, we can see that our people are our greatest resource. *See, e.g.*, *Saine v. State*, 210 N.C. App. 594, 604-05, 709 S.E.2d 379, 388 (2011) ("Educating North Carolinians certainly promotes the welfare of our State, particularly at a time when unemployment is high and many jobs that have historically not required education beyond a high school diploma, or its equivalent, are rapidly disappearing."). Therefore, while students enrolled in private schools may be receiving a fine education, if taxpayer money is spent on a private school education that does not prepare them to function in and to contribute to our state's society, that spending cannot be for "public purposes only." In my view, spending on private schools through the Opportunity Scholarship Program, which includes no means to measure the quality of the education, cannot satisfy the second prong of the *Madison Cablevision* test. The main constitutional flaw in this program is that it provides no framework at all for evaluating any of the participating schools' contribution to public purposes; such a huge omission is a constitutional black hole into which the entire program should disappear.

I am not persuaded by any of defendants' arguments that the program, as created, contains standards that are constitutionally relevant or adequate. Defendants assert that "layers" of accountability standards are built into the Opportunity Scholarship Program. I find none of these arguments convincing. First, defendants argue that the "educational marketplace" will regulate the quality of the

education provided by participating schools. Defendants assert that parents will not send their children to schools that do not provide a solid education or adequately prepare students for college or beyond. This may be true, but marketplace standards are not a measure of constitutionality. To the contrary, this Court must insulate constitutional standards from the whims of the marketplace. *See Maready v. City of Winston-Salem*, 342 N.C. 708, 739, 467 S.E.2d 615, 634 (1996) (Orr, J., dissenting) ("While economic times have changed and will continue to change, the philosophy that constitutional interpretation and application are subject to the whims of 'everybody's doing it' cannot be sustained.").

In a related argument, both intervenor legislative officers and intervenor parents contend that, because parents choose the private schools, the program is "directly accountable to the parents." This argument serves only to underscore that the program serves the private interests of the particular families and not the public good. While families are surely entitled to choose schools for their children according to their interests, a program like the Opportunity Scholarship Program that spends taxpayer money must, to be constitutional, serve "public purposes only."

Second, defendants look to the statutory requirements governing all private and nonpublic schools in North Carolina. These standards relate to attendance, health, and safety, and also require standardized testing at certain intervals. *See* N.C.G.S. §§ 115C-547 to -562 (2013). Here, however, we are not considering standards for private schools that receive no public funding. Those schools are not

governed by the same constitutional requirements as schools receiving public funding; they need not serve "public purposes only." When considering these statutory standards in a public purpose context, it is clear that they do not help measure whether the students enrolled are receiving an education that prepares them to function in our state's society. Even the requirement regarding standardized testing falls short: that provision simply mandates that all private schools "administer, at least once in each school year, a nationally standardized test . . . to all students enrolled or regularly attending grades three, six, and nine." *Id.* § 115C-549; *see also id.* § 115C-557. A similar testing requirement exists for eleventh grade students. *Id.* § 115C-550; *see also id.* § 115C-558. These testing standards do not specify that students take any particular test, nor do they require any minimum result. When a wide range of testing options are available and administered, it can be difficult to compare results across schools (a tool which is regularly used to determine the efficacy of our public schools). While the regulations governing private schools do require comparisons with public school populations, these provisions impose no consequences, regardless of test results. Moreover, the standards require no accreditation of schools and no particular training or certification of teachers. As a result, these standards fail to ensure that spending on these schools through public Opportunity Scholarship Program funds is for any public purpose.

Third, defendants point to statutes regulating schools participating in the Opportunity Scholarship Program. In addition to the above requirements for private and nonpublic schools, schools wishing to participate in the program must also:

(1) Provide to the [State Education Assistance] Authority documentation for required tuition and fees charged to the student by the nonpublic school.

(2) Provide to the Authority a criminal background check conducted for the staff member with the highest decision-making authority, as defined by the bylaws, articles of incorporation, or other governing document, to ensure that person has not been convicted of any crime listed in G.S. 115C-332.

(3) Provide to the parent or guardian of an eligible student, whose tuition and fees are paid in whole or in part with a scholarship grant, an annual written explanation of the student's progress, including the student's scores on standardized achievement tests.

(4) Administer, at least once in each school year, a nationally standardized test or other nationally standardized equivalent measurement selected by the chief administrative officer of the nonpublic school to all eligible students whose tuition and fees are paid in whole or in part with a scholarship grant enrolled in grades three and higher. The nationally standardized test or other equivalent measurement selected must measure achievement in the areas of English grammar, reading, spelling, and mathematics. Test performance data shall be submitted to the Authority by July 15 of each year. Test performance data reported to the Authority under this subdivision is not a public record under Chapter 132 of the General Statutes.

(5) Provide to the Authority graduation rates of the students receiving scholarship grants in a manner consistent with nationally recognized standards.

> (6) Contract with a certified public accountant to perform a financial review, consistent with generally accepted accounting principles, for each school year in which the school accepts students receiving more than three hundred thousand dollars ($300,000) in scholarship grants awarded under this Part.

*Id.* § 115C-562.5(a) (2014). Like the standards referenced above for private schools in general, none of these additional requirements relates to the quality of education received by enrolled students. Simply mandating that a report card be sent home to parents provides no guarantee that the education received is sufficient. And the same problems exist as articulated above regarding the requirements to administer standardized tests.

Finally, defendants point out the Opportunity Scholarship Program is required by statute to report to the General Assembly. Under Section 115C-562.7, the program's overseers must report annually to the legislature specific administrative statistics (relating to enrollment numbers, student demographics, and funds received), as well as "[l]earning gains or losses of students receiving scholarship grants." *Id.* § 115C-562.7 (2014). While the data will allow the legislature insight into the successes of the program, such reporting does not determine constitutionality. First, the legislature is under no obligation to act on the reports. Second, as we held long ago in *Madison Cablevision*, it is ultimately up to this Court to determine if public spending serves a public purpose. 325 N.C. at 644-45, 386 S.E.2d at 206. Legislative oversight does not automatically make a controversial

program constitutional, particularly when, as here, the law creating and governing the program mandates no action.

Defendants themselves admit that the program lacks the standards outlined in *Hoke County* for the employment of certified teachers and principals and for curriculum. *Hoke Cty. Bd. of Educ.*, 358 N.C. at 636, 599 S.E.2d at 389. Despite this concession, they argue that because this is a facial challenge to the statute, plaintiffs must show that the program is unconstitutional under all conceivable facts and circumstances. *See, e.g.*, *Martin v. N.C. Hous. Corp.*, 277 N.C. 29, 44, 175 S.E.2d 665, 673 (1970). To that end, defendants argue that even if substantive standards were required under our state constitution, some of the participating private schools would meet those standards. This argument falls short, however, because our state constitution mandates that *every child* obtaining an education paid for by public funds receive an education that prepares him to succeed in society, and because we are analyzing the statutory framework of the program, not the merits of a specific school. N.C. Const. art. I, § 15; *id.* art. IX, § 2(1); *Leandro*, 346 N.C. at 351, 488 S.E.2d at 257 (concluding that our state constitution "requires that *all children* have the opportunity for a sound basic education" (emphasis added)). While I acknowledge that "[w]e seldom uphold facial challenges because it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them," it is important to remember that we must also "measure the balance struck in the statute against the minimum standards required by the

constitution." *Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280-81 (2009) (citation omitted). Here those minimum standards require that children receiving a publicly funded education obtain an education that serves a public purpose. The statute at issue here creates a program that fails to incorporate any requirement to determine, much less ensure, that any, let alone all, children enrolled are receiving a real education; as such, the statute cannot survive a facial challenge.

Private schools are free to provide whatever education they deem fit within the governing statutes' requirements. When parents send their children to any private school of their choosing on their own dime, as they are free to do, that education need not satisfy our constitutional demand that it be a for a public purpose. However, when public funds are spent to enable a private school education, that spending must satisfy the public purpose clause of our constitution by preparing students to contribute to society. Without meaningful standards meant to ensure that this or any minimum threshold is met, public funds cannot be spent constitutionally through this Opportunity Scholarship Program.

As stated above, I would not necessarily impose the same detailed requirements on our private schools receiving public funds as are imposed on purely public schools by *Leandro* and its progeny. I do conclude that such spending must include some standards by which to measure compliance with the public purpose doctrine; the complete lack of any such standards in North Carolina's voucher

program makes determining such compliance impossible. It is instructive that all other states that have adopted similar programs have included substantive requirements. Although other states certainly are not bound by constitutional obligations identical to ours, examining their similar programs and the substantive standards imposed on participating schools exposes the woeful lack of oversight in the Opportunity Scholarship Program here. For example, compared with ten similar programs across the country, North Carolina's program falls painfully short. As opposed to other jurisdictions' legislative requirements for participating private schools in the categories of state approval or accreditation, state-required curriculum, required teacher qualifications, required participation in a state testing program, and required number of instructional days or hours, the Opportunity Scholarship Program fails to incorporate any of those mandates. In comparison, six of the ten other jurisdictions have requirements in all those areas; nine out of ten have requirements in at least four of the five areas; and all ten have requirements in at least one of these areas.[13] For example, in Indiana (which has the largest state wide voucher program in the country), participating schools must be accredited, Ind. Code. § 20-51-1-6(a)(3) (2010); Ind. Code. Ann. § 20-51-1-4.7(4) (West 2013), and must teach subjects prescribed by the State, Ind. Code. Ann. § 20-51-4-1(f)(9) (West 2011). These

---

[13] According to the brief filed by amici curiae Education Scholars, the other jurisdictions include Arizona, Cleveland, the District of Columbia, Indiana, Louisiana, Maine, Milwaukee, Ohio, Vermont, and Wisconsin.

schools must participate in state wide testing. *Id.* § 20-51-1-4.7(5) (West 2013). In Louisiana participating schools must be approved by a state board, and approval is contingent on a showing that the quality of the curriculum is at least as high as that mandated for similarly situated public schools. La. Stat. Ann. § 17:11 (2001); *id.* § 17:4021(A) (West Supp. 2012). Even in Arizona, the least regulated jurisdiction behind North Carolina identified by amici, participating schools must educate students in reading, grammar, math, social studies, and science. Ariz. Rev. Stat. Ann. § 15-2402(B)(1) (West Supp. 2011). As summarized above, North Carolina's Opportunity Scholarship Program lacks any kind of substantive oversight, curriculum standards, or instructional requirements. Schools receiving public funding through the program are essentially free to employ whomever they desire to teach whatever they desire. This is a perfectly acceptable scheme for truly private schools, but it fails utterly to satisfy the constitutionally mandated educational standards required when public funds are spent on education.

This failure brings me to the second constitutional flaw in the Opportunity Scholarship Program: the breach of the State's duty to guard and maintain the right to the privilege of education as set forth in Article I, Section 15, which is part of our constitution's Declaration of Rights. Notwithstanding this constitutional provision's clear statement that the people of our State have "a right to . . . education" and that it is the State's duty "to guard and maintain that right," N.C. Const. art. I, § 15, the majority indicates that this constitutional provision merely states a "general

proposition concerning the right to the privilege of education"; that this provision is merely aspirational, rather than substantive, in nature; and that plaintiffs' reliance on it as an independent source of relief is misplaced. The majority has not, however, cited any decision from this Court in support of this proposition, and I believe the majority's assertion is inconsistent with this Court's constitutional jurisprudence.

In *Leandro* this Court concluded that Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution worked together in combination to "guarantee every child of this state an opportunity to receive a sound basic education in our public schools." 346 N.C. at 347, 488 S.E.2d at 255. In other words, this Court gave Article I, Section 15, considered in conjunction with other constitutional provisions, substantive effect. As such, the plain language of Article I, Section 15 and this Court's decision in *Leandro* regarding the interplay between Article I, Section 15 and Article IX, Section 2 makes me unable to accept the majority's statements regarding the substantive import of this constitutional provision. *See* John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 62-63 (2d ed. 2013) (citing *Leandro* as an example in which, along with other constitutional provisions, Article I, Section 15 was given substantive effect by this Court and stating that "[i]n addition to the substantive component, this section may also secure other rights, the violation of which could subject a local school board to suit without the benefit of governmental immunity or insurance coverage").

Turning to the application of Article I, Section 15 to the instant matter, this voucher program, as explained above, allows for taxpayer funds to be spent on private schooling with no required standard to ensure that teachers are competent or that students are learning at all. I must conclude that by creating this program, the State's legislature has completely abrogated the duty to "guard and maintain [the] right" to an education. N.C. Const. art I, § 15. As the trial court concluded, "[t]he General Assembly fails the children of North Carolina when they are sent with taxpayer money to private schools that have no legal obligation to teach them anything." This failure violates the duty set forth in Article I, Section 15.

This Court's duty to the people of our State, as expressed in several clauses of our constitution, is to ensure that if taxpayer money is spent on private education, the expenditure is for an education that can prepare our children to participate and thrive in our state's society. When the General Assembly fails to ensure that these constitutional requirements are satisfied, this Court must exercise its responsibility to do otherwise. Because the majority fails to do so, I respectfully dissent.

Justices BEASLEY and ERVIN join in this dissenting opinion.

Justice BEASLEY dissenting.

I join fully Justice Hudson's dissent. I write separately to explain my additional concerns with the Opportunity Scholarship Program as currently enacted. I also write to urge caution and to reiterate the State's duties under the North Carolina Constitution "to guarantee every child of this state an opportunity to receive a sound basic education in our public schools," *Leandro v. State*, 346 N.C. 336, 347, 488 S.E.2d 249, 255 (1997), and to "*afford*[ ] *school facilities of recognized and ever-increasing merit to all the children of the State . . . to the full extent that our means could afford and intelligent direction accomplish*," *id.* at 346, 488 S.E.2d at 254 (emphasis added) (quoting *Bd. of Educ. v. Bd. of Cty. Comm'rs*, 174 N.C. 469, 472, 93 S.E. 1001, 1002 (1917)).

The Supreme Court of the United States made the following prescient observation regarding education more than sixty years ago. These words remain equally valid now.

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made

available to all on equal terms.

*Brown v. Bd. of Educ.*, 347 U.S. 483, 493, 74 S. Ct. 686, 691, 98 L. Ed. 873, 880 (1954), *additional proceedings at* 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955). Central to the Court's decision was the understanding that "[w]e must consider public education in the light of its full development and its present place in American life." *Brown*, 347 U.S. at 492, 74 S. Ct. at 691, 98 L. Ed. 2d at 880.

Free public education historically has been, and today remains, vital to American life. Its diminishment in quality or its concentration among a few invites despots to power and risks oppressing the rest. With continued necessity for preserving and promoting free public education clearly in view, I turn to the Opportunity Scholarship Program.

The Court correctly explains that our circumspect inquiry is constrained to the facial challenge presented in view of established principles of constitutional interpretation. Nonetheless, the majority's opinion should not be read so broadly as to set an impossible standard for a facial challenge to legislation, particularly when the legislation stands to affect the education of the children of North Carolina. *Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280-81 (2009) ("This Court will only measure the balance struck in the statute against the minimum standards required by the constitution."). It is well established that, subject to the constitution, it is for the General Assembly to "establish minimum educational requirements and standards." *Delconte v. State*, 313

N.C. 384, 402, 329 S.E.2d 636, 647 (1985); s*ee id.* at 401-02, 329 S.E.2d at 647 ("We also recognize that the state has a compelling interest in seeing that children are educated and may, constitutionally, establish minimum educational requirements and standards for this education." (citations omitted)). But those standards must comport with the constitutional minimum, and it has long been beyond dispute that this Court has jurisdiction to determine whether legislation meets the minimum allowed by our Constitution. *E.g., Bayard v. Singleton*, 1 N.C. 5 (1787).

This Court already has articulated "the minimum standards required by the constitution," *Beaufort Bd. of Educ.*, 363 N.C. at 502, 681 S.E.2d at 281, when the General Assembly purports to provide for public education. In *Leandro* we "address[ed] plaintiff-parties' constitutional challenge to the state's public education system." 346 N.C. at 345, 488 S.E.2d at 254. We explained that the North Carolina Constitution guarantees every child the right to a sound basic education, and we defined the mandate for public education by explaining that

> [f]or purposes of our Constitution, a "sound basic education" is one that will provide the student with at least: (1) sufficient ability to read, write, and speak the English language and a sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable the student to make informed choices with regard to issues that affect the student personally or affect the student's community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational training;

> and (4) sufficient academic and vocational skills to enable the student to compete on an equal basis with others in further formal education or gainful employment in contemporary society.

*Id.* at 347, 488 S.E.2d at 255 (citations omitted).

Although *Leandro* concerned public schools, this Court has established that the particular type of building in which the education occurs is immaterial. *See Delconte*, 313 N.C. 384, 329 S.E.2d 636 (allowing home schools). It is the opportunity for a constitutionally permissible minimum quality of education that is essential. If the General Assembly appropriates public funds[14] for public education, whether that education occurs in public schools or nonpublic schools receiving public funds, the General Assembly is limited to doing so only for the constitutionally permissible public purpose of providing a "sound basic education." When *public funds* are used for *nonpublic initiatives* to fulfill the constitutional public education mandate, the appropriation may violate the public purpose clause, especially if the grant recipients are chosen because the public school system fails to meet their educational needs.

In denying relief for plaintiffs under North Carolina Constitution Article IX, Sections 2(1), 5, and 6, the majority posits that these sections constitutionally protect

---

[14] The General Assembly is conspicuously careful to avoid acknowledging that the grants at issue are public funds. *See, e.g.*, N.C.G.S. § 115C-555 (2013) ("For the purposes of this Article, scholarship grant funds awarded pursuant to Part 2A of this Article to eligible students attending a nonpublic school *shall not be considered funding from the State of North Carolina.*") (emphasis added); *id.* § 115C-562.1(6) (2013) (defining "Scholarship grants" as "Grants awarded annually by the Authority to eligible students"). The majority correctly notes that the program is funded through appropriations from the general revenue of the Board of Governors of The University of North Carolina.

funds designated for education but do not limit the General Assembly's designation of other public funds for additional nonpublic education initiatives. In setting education policy, the danger posed by the General Assembly in designating general funds for nonpublic education and a non-public purpose is that it effectively undermines the support the legislature is constitutionally obligated to provide to the public school system. Because the Opportunity Scholarship Program circumvents the mission of public schools to successfully offer a sound basic education to all students, the General Assembly has failed to meet the mandated minimum standard.

Given North Carolina's history of public education and the State's continued efforts to address shortcomings to deliver on its constitutional mandate, the General Assembly's decision to pursue vouchers at this time and in this way is vexing.[15] The majority notes that the purpose of the grants is to address grade level deficiencies of a "large percentage of economically disadvantaged students," but as shown below, it is unclear whether or how this program truly addresses those children's needs. While every member of this Court fully recognizes the legislature's responsibility to implement education policy and its right to pursue novel approaches, *Redev. Comm'n v. Sec. Nat'l Bank of Greensboro*, 252 N.C. 595, 612, 114 S.E.2d 688, 700 (1960), this

---

[15] There may be instances when the use of public funds for nonpublic schools can serve a public purpose. While public schools are supposed to accommodate all students' educational needs, some circumstances exist in which the public purpose may be best met by funding a nonpublic educational situation, such as the education of children with disabilities under North Carolina General Statutes Chapter 115C, Subchapter IV, Article 9. This issue, however, is not before our Court at this time.

Court should not permit the State to lessen its obligation to the children of North Carolina.

In endeavoring to provide its citizens with a sound basic education, North Carolina has long embraced a complex variety of educational initiatives, including public schools, secular and sectarian private schools, and home schools. *See generally* M.C.S. Noble, *A History of the Public Schools of North Carolina* (1930) (discussing the history of public education in North Carolina, including the development of curricula, religious instruction in public schools, teachers' qualifications, and segregated schools); *see also Delconte*, 313 N.C. at 397-400, 329 S.E.2d at 645-46 (summarizing the development of public education legislation). Our legislature has met the standard with varying degrees of success. It is worth observing that our General Assembly previously embraced vouchers for approximately a decade as a means to avoid the State's obligation under the U.S. Constitution to desegregate public schools as required by the Supreme Court of the United States in its seminal *Brown v. Board* decisions. *See* Milton Ready, *The Tar Heel State: A History of North Carolina* 349 (2005) (describing the "Pearsall Plan" as "a stubbornly conservative strategy that eventually satisfied no one"); *id.* at 355-56 (explaining that beginning in the 1960s and 1970s, "[s]ophisticated racial and segregationist appeals . . . . took on a more abstract form" and "[m]any of the newer strategies came wrapped in terms as local control, vouchers, charter schools, tax cuts, distributive welfare, and limited government interference in the private affairs of ordinary citizens"); *see also Hawkins*

*v. N.C. State Bd. of Educ.*, No. 2067, 11 Race Rel. L. Rep. 745 (W.D.N.C. Mar. 31, 1966) (declaring the Pearsall Plan facially unconstitutional). Indeed, some of our schools are only now achieving unitary status under long-standing federal orders to desegregate. *E.g.*, *Everett v. Pitt Cty. Bd. of Educ.*, 788 F.3d 132 (4th Cir. 2015). Even those victories, however, are tempered by a different reality:

> The rapid rate of de facto resegregation in our public school system in recent decades is well-documented. As one scholar put it, "Schools are more segregated today than they have been for decades, and segregation is rapidly increasing." Erwin Chemerinsky, *Separate and Unequal: American Public Education Today,* 52 Am. U. L. Rev. 1461, 1461 (2003) (footnote omitted); *see also* Lia B. Epperson, *Resisting Retreat: The Struggle for Equity in Educational Opportunity in the Post–Brown Era,* 66 U. Pitt. L. Rev. 131, 145 (2004) ("American public schools have been steadily resegregating for more than a decade, dismantling the integrative successes of hundreds of districts that experienced significant levels of integration in the wake of *Brown* and its progeny. Such racial isolation in public schools is worse today than at any time in the last thirty years.").

*Id.* at 150-51 (Wynn, J., dissenting).

For now, as noted by the majority, the program is available only to lower-income families. This availability assumes that private schools are available within a feasible distance, that these families win the grant lottery, and that their children gain admission to the nonpublic school of their choice. With additional costs for transportation, tuition, books, and, at times, school uniforms, for the poorest of these families, the "opportunity" advertised in the Opportunity Scholarship Program is

merely a "cruel illusion." *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 154-55 (Tenn. 1993) ("[E]ducational opportunity of the children in this state should not be controlled by the fortuitous circumstance of residence . . . . Such a system only promotes greater opportunities for the advantaged while diminishing the opportunities for the disadvantaged. . . . 'The notion of local control was a "cruel illusion" for the poor districts due to limitations placed upon them by the system itself. . . .'") (first and second ellipses in original) (quoting *Dupree v. Alma Sch. Dist. No. 30*, 279 Ark. 340, 346, 651 S.W.2d 90, 93 (1983)) (third ellipsis in original))).

Without systemic and cultural adjustments to address social inequalities, the further cruel illusion of the Opportunity Scholarship Program is that it stands to exacerbate, rather than alleviate, educational, class, and racial divides. *See generally* Julian E. Zelizer, *How Education Policy Went Astray*, The Atlantic (Apr. 10, 2015), http://www.theatlantic.com/education/archive/2015/04/how-education-policy-went-astray/390210/ (last visited July 16, 2015) (discussing changes in American education policy over the past fifty years and the relationship between continually failing education policy and economic inequality). *See also* Br. for N.C. Conference of the NAACP as Amicus Curiae Supporting Plaintiff-Appellees at 3-9, *Hart v. State*, ___ N.C. ___, ___ S.E.2d ___ (2015) (No. 372A14) (discussing discriminatory "creaming" and "cropping" practices by which private schools admit "the best and least costly students" or "deny[ ] services and enrollment to diverse learners" (citations omitted)). In time, public schools may be left only with the students that private schools refuse

to admit based on perceived lack of aptitude, behavioral concerns, economic status, religious affiliation, sexual orientation, or physical or other challenges, or public schools may become grossly disproportionately populated by minority children. The policy promoted by the Opportunity Scholarship Program, therefore, may serve to widen already considerable gaps and create a larger class of underserved children.