IN RE: THE DENIAL OF APPROVAL TO ISSUE $30,000,000.00 OF SINGLE FAMILY HOUSING BONDS AND $30,000,000.00 OF MULTI-FAMILY HOUSING BONDS FOR PERSONS OF MODERATE INCOME

No. 196PA82

(Filed 3 November 1982)

**Constitutional Law § 11; Statutes § 2.6; Taxation § 7.2— bonds to finance single and multi-family housing for persons of moderate income—serves public purpose—valid exercise of tax power**

The 1979 amendment to the North Carolina Housing Finance Agency Act, G.S. 122A-54.4, which provided for issuance of bonds to finance single and multi-family housing for persons of moderate income, was enacted for a public purpose, and is, therefore, a valid exercise of the State's power to tax under Article V, Section 2(1) of the North Carolina Constitution.

THIS case was heard before *Bailey, Judge*, at the 1 March 1982 Session of Superior Court, WAKE County. Judgment was entered on 11 March 1982. Defendant appealed and both parties petitioned this Court, under G.S. 7A-31 (1981), for discretionary review before the case was heard by the Court of Appeals. We allowed the petition on 13 July 1982.

The primary question on this appeal is whether the North Carolina Housing Finance Agency's issuance of bonds to finance single and multi-family housing for persons of moderate income serves a public purpose and is, therefore, a valid exercise of the power to tax under article V, section 2(1) of the North Carolina Constitution.

*Powe, Porter and Alphin, P.A., by W. Travis Porter, James L. Stuart, and Eugene F. Dauchert, Jr., for plaintiff North Carolina Housing Finance Agency.*

*Rufus L. Edmisten, Attorney General, by Douglas A. Johnston, Assistant Attorney General, for defendant Local Government Commission.*

CARLTON, Justice.

In 1969 the General Assembly enacted the North Carolina Housing Finance Agency Act, G.S. 122A-1 to 122A-23 (1981 & Cum. Supp. 1981), declaring "that the purposes of [the Act] are to provide financing for residential housing construction, new or rehabilitated, for sale or rental to persons and families of *lower* income." G.S. 122A-2 (1981) (emphasis added). This Court, determining that it was enacted for a public purpose, upheld the Act's constitutionality. *Martin v. North Carolina Hous. Corp.*, 277 N.C. 29, 175 S.E. 2d 665 (1970). In 1979 the General Assembly added another provision to the Act in order to extend its reach to "persons and families of *moderate* income." G.S. 122A-5.4 (1981) (emphasis added). In this appeal, a sequel to *Martin,* we determine whether G.S. 122A-5.4, the 1979 amendment to the Act, serves a public purpose and is, therefore, an appropriate exercise of the taxation power under article V, section 2(1) of the North Carolina Constitution.

I.

Plaintiff, the North Carolina Housing Finance Agency, is a public agency and instrumentality of the State of North Carolina. G.S. 122A-4 (1981). It has the power, under the North Carolina Housing Finance Agency Act, to do the following: issue bonds and notes, the proceeds from which may be used to purchase or make mortgages for persons of lower and moderate income so they can buy residential housing; make or participate in the making of development loans to sponsors of housing projects who lease to persons of lower and moderate income. G.S. 122A-1 to 122A-23 (1981 & Cum. Supp. 1981).

The Local Government Commission, defendant, is also an agency of the State. G.S. 159-3 (1976). It is authorized, under G.S. 122A-8 (Cum. Supp. 1981), to determine the rate of interest, price

and manner of sale of plaintiff's bonds with approval of the plaintiff.

The facts in this case are not disputed. Both parties stipulated to the following:

On 16 December 1981 plaintiff's board of directors adopted a resolution calling for the issuance of $30,000,000 worth of mortgage subsidy housing bonds. The proceeds from these bonds were to be used to purchase or make mortgages for persons of moderate income who wished to buy single-family residences. The board also adopted a resolution calling for the issuance of an additional $30,000,000 worth of housing bonds, the proceeds from which were to be used to provide project development loans to builders, sponsors and developers of multi-family residential housing units who would lease their units to persons of moderate income. Plaintiff's board also adopted temporary rules establishing moderate income limits: $23,000 for people living in rural areas and $27,000 for those living in urban areas. In adopting the temporary rules, the board considered: (a) the total income of such persons which would be available to meet their housing needs, (b) the size of the family, (c) the cost and condition of housing facilities available, and (d) the eligibility of such persons for federal housing assistance. G.S. 122A-5.4(c) (1981).

On 14 December 1981, after plaintiff notified defendant that it intended to issue the moderate income housing bonds, defendant requested an opinion from its bond counsel concerning the constitutionality of G.S. 122A-5.4 since this would be the first bond issuance proposed under the new "moderate income" provision of the Act. When this Court earlier had declared the Act constitutional, we did so at a time when the Act authorized assistance to persons of lower income only. *Martin v. North Carolina Hous. Corp.*, 277 N.C. 29, 175 S.E. 2d 665 (1970).

On 15 December 1981 defendant's secretary received an answer from bond counsel containing reservations about the constitutional status of G.S. 122A-5.4; thus, bond counsel indicated it was unable to render an unqualified approving legal opinion with respect to any bond issue of the agency to finance either single family or multi-family housing for persons of moderate income.

On 18 December 1981, after considering the opinion of bond counsel, defendant determined that it could not carry out its

duties in connection with the sale of these bonds under G.S. 122A-8 because the constitutionality of the bond issuance was in doubt. Hence, defendant passed a resolution declining to act on the moderate income housing bonds due to its inability to obtain a clear legal opinion as to the constitutionality of such an issuance, realizing that the State's credit reputation would be harmed if the bonds were to be invalidated after the issuance.

To get its bond issuance approved, plaintiff brought suit against defendant to resolve all doubts concerning the constitutionality of G.S. 122A-5.4, the statute which authorized plaintiff to assist persons of moderate income in acquiring adequate housing.

The matter was heard before Judge Bailey upon the parties' stipulation of facts as set out above. In his written findings of fact the judge stated that plaintiff had the authority to issue bonds, the proceeds from which were to be used to help people with moderate incomes secure adequate housing. However, he noted that under the Act *plaintiff's authority "is specifically conditioned on the unavailability of mortgage loans for the same purposes from private lenders upon reasonably equivalent terms and conditions."* G.S. 122A-5(2) and (3) (Cum. Supp. 1981) (emphasis added).

By implication, Judge Bailey concluded that single family and multi-family housing mortgage loans were not otherwise available from private lenders "upon reasonably equivalent terms and conditions." He did so by expressly noting that as of 16 December 1981 the average mortgage rate for conventional home mortgages in the State of North Carolina was 17%. The mortgages financed under the single family, moderate income bonds would carry a much lower interest rate: about 15%. Similarly, as of 16 December 1981, the average interest rate was 19% for project development loans to builders, sponsors and developers of multi-family housing units in the State. The project development loans financed through the multi-family moderate income housing bonds would also carry a much lower interest rate: about 15 1/2%.[1] Mortgage loans from private lenders, thus, were not available on "reasonably equivalent terms and conditions."

---

1. Plaintiff determined that the proposed bonds, if marketed in the national bond market, would carry an interest rate of about 14 1/2%.

In addition, the judge found that a survey of lending institutions indicated that substantial demand existed throughout the State for bond proceeds which would be used to provide mortgages for housing for persons of moderate income; and that the proceeds from the bonds would have been fully utilized and exhausted by lenders in the State or by the agency itself if the issuance of plaintiff's bonds had been approved and marketed.

Based on the foregoing findings of fact, Judge Bailey concluded as a matter of law that the issuance and sale of the housing bonds was for a lawful public purpose; was in accordance with the authority granted to plaintiff under G.S. 122A-5.4; and was not in conflict with article V, sections 2, 4 or 5 or any other applicable provisions of the Constitution of North Carolina.

From the foregoing, defendant gave notice of appeal to the Court of Appeals. As stated above, both parties petitioned this Court to bypass the Court of Appeals; we allowed the motion on 13 July 1982.

## II.

The North Carolina Constitution, article V, section 2(1) provides that "[t]he power of taxation shall be exercised in a just and equitable manner, *for public purposes only*, and shall never be surrendered, suspended, or contracted away." (Emphasis added.) In *Mitchell v. North Carolina Indus. Dev. Fin. Auth.*, 273 N.C. 137, 159 S.E. 2d 745 (1968), Justice Sharp wrote,

> The power to appropriate money *from* the public treasury is no greater than the power to levy the tax which put the money in the treasury. Both powers are subject to the constitutional proscription that tax revenues may not be used for private individuals or corporations, no matter how benevolent. *Horner v. Chamber of Commerce*, 231 N.C. 440, 57 S.E. 2d 789.

*Id.* at 143, 159 S.E. 2d at 749-50 (emphasis in original).

The critical question on this appeal, therefore, is whether G.S. 122A-5.4, the new provision of the North Carolina Housing Finance Agency Act which extends the Act's benefits to persons of "moderate income," is constitutional because it is an appropria-

tion of money from the public treasury[2]—a use of the State's power to tax—that serves a public purpose, not merely private interests.

In *Mitchell* and *Martin*, this Court reviewed in detail the applicable principles to be used in determining whether particular legislation serves a public purpose. We note the salient, relevant principles to be applied on review: The presumption is in favor of the constitutionality of an act, *State v. Furmage*, 250 N.C. 616, 621, 109 S.E. 2d 563, 567 (1959). All doubts must be resolved in favor of the Act, *Wells v. Hous. Auth. of Wilmington*, 213 N.C. 744, 749, 197 S.E. 693, 696 (1938). The Constitution is a restriction of powers and those powers not surrendered are reserved to the people to be exercised through their representatives in the General Assembly, *id.*; therefore, so long as an act is not forbidden, the wisdom and expediency of the enactment is a legislative, not a judicial, decision, *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E. 2d 888, 891-92 (1961). "The General Assembly, exercising the police power of the State, may legislate for the protection of the public health, safety, morals and general welfare of the people," *Martin v. North Carolina Hous. Corp.*, 277 N.C. at 45, 175 S.E. 2d at 674. "The General Assembly has the right to experiment with new modes of dealing with old evils, except as prevented by the Constitution," *Redev. Comm'n of Greensboro v. Sec. Nat'l Bank of Greensboro*, 252 N.C. 595, 612, 114 S.E. 2d 688, 700 (1960). Justice Sharp aptly summarized our judicial task as follows:

> The initial responsibility for determining what is and what is not a public purpose rests with the legislature, and its findings with reference thereto are entitled to great weight. If, however, an enactment is in fact for a private purpose, and therefore unconstitutional, it cannot be saved by legislative declarations to the contrary. When a constitutional question is properly presented, it is the duty of the court to ascertain and declare the intent of the framers of the Constitution and to reject any legislative act which is in conflict therewith. *State v. Felton*, 239 N.C. 575, 80 S.E. 2d 625; *Nash*

---

2. In *Martin*, it is noted that $500,000 was appropriated from the General Fund of the State to implement the Act. 277 N.C. at 42, 175 S.E. 2d at 672.

*v. Town of Tarboro,* 227 N.C. 283, 42 S.E. 2d 209; 1 Strong, N.C. Index, Constitutional Law § 10 (1957).

*Mitchell v. North Carolina Indus. Dev. Fin. Auth.,* 273 N.C. at 144, 159 S.E. 2d at 750.

In the 1979 amendment to the North Carolina Housing Finance Agency Act extending the Act's benefits to people of "moderate income," G.S. 122A-5.4, the General Assembly stated in clear and concise terms its declaration as to public purpose:

(a) The General Assembly hereby finds and determines that there is a serious shortage of decent, safe and sanitary housing which persons and families of moderate income in the State can afford; that it is in the best interests of the State to encourage home ownership by persons and families of moderate income; that the assistance provided by this section will enable persons and families of moderate income to acquire existing decent, safe and sanitary housing without undue financial hardship and will encourage private enterprise to sponsor, build and rehabilitate additional housing for such persons and families; and that the Agency in providing such assistance is promoting the health, welfare and prosperity of all citizens for the State and is serving a public purpose for the benefit of the general public.

(b) The terms "persons and families of lower income" and "persons of lower income" wherever they appear in this Chapter, except where they appear in G.S. 122A-2 and 122A-3(11), shall be deemed to include "persons and families of moderate income" as defined in clause (c) of this section.

(c) "Persons and families of moderate income" means persons and families deemed by the Agency to require the assistance made available by this Chapter on account of insufficient personal or family income taking into consideration, without limitation, (i) the amount of the total income of such persons and families available for housing needs, (ii) the size of the family, (iii) the cost and condition of housing facilities available and (iv) the eligibility of such persons and families for federal housing assistance of any type predicated upon a moderate or low and moderate income basis.

This Court noted in *Martin* that when

the constitutionality of a statute . . . depends on the existence or non-existence of certain facts and circumstances, the existence of such facts and circumstances will generally be presumed for the purpose of giving validity to the statute, . . . if such a state of facts can reasonably be presumed to exist, and if any such facts may be reasonably conceived in the mind of the court.

277 N.C. at 44, 175 S.E. 2d at 673, citing 16 C.J.S. Constitutional Law § 100b, pp. 454-55.

The legislature made its public purpose crystal clear in the added statute. That the facts giving rise to the amendment, and stated in the statute, do exist is hardly a matter for debate in the present state of the nation's economy. Indeed, the stipulation of the parties and the trial court's findings of fact indicated that the need exists in North Carolina for the sort of financing that G.S. 122A-5.4 will help provide. As noted above, the trial court impliedly found that private enterprise is unable to meet the need in this State for housing financing. It is readily apparent from defendant's survey that there were no conventional mortgage loans substantially equivalent to those which would have been available under the proposed bonds. Demand for the bond proceeds would have exceeded the amount available.

In deciding whether the 1979 amendment serves a "public purpose" in directing some of the Act's benefits to those with slightly higher incomes than originally anticipated, we find this statement in *Mitchell* particularly pertinent:

A slide-rule definition to determine public purpose for all time cannot be formulated; the concept expands with the population, economy, scientific knowledge, and changing conditions. As people are brought closer together in congested areas, the public welfare requires governmental operation of facilities which were once considered exclusively private enterprises, (citation omitted) and necessitates the expenditure of tax funds for purposes which, in an earlier day, were not classified as public. (Citation omitted.) Often public and private interests are so co-mingled that it is difficult to determine which predominates. It is clear, however, that for a use

to be public its benefits must be in common and not for particular persons, interests or estates; the ultimate net gain or advantage must be the public's as contradistinguished from that of an individual or private entity.

273 N.C. at 144, 159 S.E. 2d at 750.

We find the extensive discussion of Chief Justice Bobbitt in *Martin* articulating the various ways in which the original Act served a valid public purpose equally applicable here. Chief Justice Bobbitt noted that "[u]nquestionably, when construction of *residential housing is made possible by the* [North Carolina Housing Finance Agency's] assistance, all persons in the building industry benefit . . . ." 277 N.C. at 49, 175 S.E. 2d at 676. More importantly, however, Chief Justice Bobbitt pointed out that "the reason and justification for [the Agency's] existence, is to make available decent, safe and sanitary housing to 'persons and families of lower income' who cannot otherwise obtain such housing accommodations." *Id.,* 175 S.E. 2d at 677. In expanding the Agency's power to help those with "moderate incomes," the legislature is acting with the same public purpose in mind. It is attempting "to make available decent, safe and sanitary housing" to another group "who cannot otherwise obtain such housing accommodations." As noted in *Mitchell* no "slide-rule definition" of public purpose can be formulated: the concept changes with such factors as the condition of the economy. Any casual observer knows that the present economy is drastically different from that existing at the time the Act was originally enacted. Such an observer is equally aware of the serious problems facing those with moderate incomes who wish to acquire decent housing for their families. We agree with the appellee that issuance of the proposed bonds would benefit all the citizens of our State. The infusion of low interest mortgage money into the private construction industry should inevitably lead to more jobs, increased local and state tax revenues, more stable neighborhoods and an enhanced economy generally. The supply of available residential housing ultimately would be increased, thus generally improving the opportunities for our people to obtain better housing. Moreover, as noted in *Martin,* the acquisition of houses by people otherwise unable to afford them provides those same people with a stake in the preservation of our society that they would not have were it not for the Agency's assistance. 277 N.C. at 49-50,

175 S.E. 2d at 677. A lack of adequate housing inevitably engenders slum-like conditions, a situation the legislature obviously sought to eliminate with its proposed bond proceeds.

In summary, we find that the public purpose of the Act has not changed, only the economy has. The legislature has appropriately responded to the changing conditions in the residential housing market, and the benefits flowing from the 1979 amendment to the Act are, in our opinion, benefits for the common good of all the people of the State. The increase in available housing which would result from the proposed bonds would further the aim of promoting the health, safety and general welfare of our people. The Agency's authorized activities respond to a serious need of deep public concern, and do so *only* when the planning, construction and financing of decent residential housing is not otherwise available to those "who cannot otherwise obtain such housing." The definition of those "who cannot otherwise obtain such housing" has been, as noted above, appropriately expanded.

Therefore, we hold that the 1979 amendment to the North Carolina Housing Finance Agency Act, G.S. 122A-5.4 (1981), was enacted for a public purpose, and is, therefore, a valid exercise of the State's power to tax under article V, section 2(1) of the North Carolina Constitution.[3]

## III.

In its brief, and in an obvious abundance of caution, appellee calls our attention to other provisions of the North Carolina Constitution which it also contends are not violated by the original Act or the 1979 amendment. Specifically, we are referred to article V, sections 2(3), 4, and 5. We find it unnecessary to discuss the applicability of each of these sections of our Constitution to the case at bar because any argument that could be made that these

---

3. Decisions from other jurisdictions are in accord with our decision today. *See e.g., Massachusetts Home Mortgage Fin. Agency v. New England Merchants Nat'l Bank,* 376 Mass. 669, 382 N.E. 2d 1084 (1978); *Minnesota Hous. Fin. Agency v. Hatfield,* 297 Minn. 155, 210 N.W. 2d 298 (1973); *Johnson v. Pennsylvania Hous. Fin. Agency,* 453 Pa. 329, 309 A. 2d 528 (1973); Opinion to the Governor, 112 R.I. 151, 308 A. 2d 809 (1973); *Bauer v. South Carolina State Hous. Auth.,* 271 S.C. 219, 246 S.E. 2d 869 (1978); *West v. Tennessee Hous. Dev. Agency,* 512 S.W. 2d 275 (1974); *Infants v. Virginia Hous. Dev. Auth.,* 221 Va. 659, 272 S.E. 2d 649 (1980).

provisions render the Act unconstitutional either have been previously answered in *Martin* or are without merit. *Martin v. North Carolina Hous. Corp.*, 277 N.C. at 53-58, 175 S.E. 2d at 679-82 (determining that the tax-exempt status of bonds issued under the Act does not violate what is now article V, section 2(3) and that this method of financing does not create a debt or pledge of the State's credit so as to violate what is now article V, section 4); G.S. 122A-2 (1981) (sets out the purpose of the Agency and the purpose for which the proceeds are to be used as required by article V, section 5).

The judgment of the trial court dated 11 March 1982 is therefore

Affirmed.