IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1255

Filed: 6 October 2015

Wake County, No. 13-CVS-6691

CITY OF ASHEVILLE, a municipal corporation, Plaintiff,

v.

STATE OF NORTH CAROLINA and the METROPOLITAN SEWERAGE DISTRICT
OF BUNCOMBE COUNTY, NORTH CAROLINA, Defendants.

Appeal by Defendants from "Memorandum of Decision and Order Re:
Summary Judgment" entered 9 June 2014 by Judge Howard E. Manning, Jr., in
Wake County Superior Court. Heard in the Court of Appeals 3 June 2015.

*Parker, Poe, Adams & Bernstein LLP, by Daniel G. Clodfelter, City Attorney for
the City of Asheville, by Robin T. Currin and Robert W. Oast, Jr., Long, Parker,
Warren, Anderson & Payne, P.A., by Robert B. Long, Jr., and Moore & Van
Allen PLLC, by T. Randolph Perkins, for the Plaintiff-Appellee.*

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General I.
Faison Hicks, for the Defendant-Appellant.*

*Cauley Pridgen, P.A., by James P. Cauley, III, and Gabriel Du Sablon, for
Amicus Curiae, the City of Wilson.*

*Kimberly S. Hibbard and Gregory F. Schwitzgebel, III, for Amicus Curiae, the
North Carolina League of Municipalities.*

DILLON, Judge.

The City of Asheville ("Asheville") commenced this action against the State of

North Carolina, challenging the constitutionality of certain legislation enacted by our

General Assembly in 2013. A provision in this legislation requires Asheville to cede ownership and control of its public water system to another political subdivision. The trial court entered an order enjoining this involuntary transfer, concluding that the legislation violated the North Carolina Constitution.

We affirm the trial court's conclusion that Asheville has standing to challenge the authority of the General Assembly in this matter. We reverse the court's conclusions regarding the legislation's constitutionality and its injunction and remand the matter for further proceedings consistent with this opinion.

## I. Background

The General Assembly has empowered municipalities to own and operate public water systems and public sewer systems and to serve customers both inside and outside of their corporate limits. N.C. Gen. Stat. § 160A-312.

Asheville is a municipality which owns and operates a public water system (the "Asheville Water System"). Asheville, however, does not operate a public sewer system. Rather, the public sewer system is owned and operated by a metropolitan sewerage district (an "MSD").[1] Like a municipality, an MSD is a type of political subdivision authorized by the General Assembly. N.C. Gen. Stat. § 162-64, *et seq*.

The relationship between Asheville and its water customers living outside of its corporate limits has historically been quite litigious, with many disputes resolved

---

[1] This MSD, known as the Metropolitan Sewerage District of Buncombe County, is the nominal defendant in this action.

through legislation from our General Assembly. *See Candler v. City of Asheville*, 247 N.C. 398, 101 S.E.2d 470 (1958); *City of Asheville v. State of North Carolina*, 192 N.C. App. 1, 665 S.E.2d 103 (2008).

In 2013, our General Assembly enacted legislation (the "Water/Sewer Act") which withdraws from Asheville the authority to own and operate the Asheville Water System and transfers the System to the Buncombe County MSD as follows:

The Water/Sewer Act creates a new type of political subdivision known as a *metropolitan water and sewerage district* (an "MWSD"), empowered to run both a public water system and a public sewer system within a defined jurisdiction. An MWSD may be formed either *voluntarily* or *by operation of law*. An MWSD is formed *voluntarily* when two or more political subdivisions (*e.g.*, cities and MSD's) consent to form an MWSD to consolidate the governance of the public water and sewer systems in their region. N.C. Gen. Stat. § 162A-85.2.

A provision in the Water/Sewer Act (the "Transfer Provision") – the provision which is at the heart of this litigation – allows for the formation of an MWSD by operation of law. This provision states that the public *water* system belonging to a municipality or other political subdivision which meets certain criteria and which happens to operate in the same county that an MSD operates a public *sewer* system *must be transferred* to that MSD, upon which the MSD converts to an MWSD. *See* 2013 N.C. Sess. Laws 50, §§ 1(a)-(f), as amended by 2013 N.C. Sess. Laws 388, § 4.

Though the Transfer Provision does not *expressly* reference Asheville by name, the *only* public water system which currently meets all of the Transfer Provision's criteria for a forced transfer to an MSD is the Asheville Water System.

---

Asheville commenced this action, challenging the legality of the Transfer Provision on several grounds. The State moved to dismiss, contending that Asheville lacked standing to challenge the General Assembly's authority to enact the legislation. Also, both parties filed cross motions for summary judgment.

Following a hearing, the trial court entered an order recognizing Asheville's standing. The trial court enjoined the application of the Transfer Provision, concluding that it violated our state constitution on *three* grounds.

The State timely appealed.

## II. Standard of Review

As this case involves the interpretation of a state statute and our state Constitution, our review is *de novo*. *See In re Vogler*, 365 N.C. 389, 392, 722 S.E.2d 459, 462 (2012).

## III. Asheville's Standing

The trial court concluded that Asheville has standing to challenge the authority of the General Assembly to enact the Transfer Provision. We agree.

Our Supreme Court has expressly held that "municipalities [have] standing to test the constitutionality of acts of the General Assembly." *Town of Spruce Pine v. Avery County*, 346 N.C. 787, 790, 488 S.E.2d 144, 146 (1997) (citing *City of New Bern v. New Bern-Craven County Bd. of Educ.*, 328 N.C. 557, 402 S.E.2d 623 (1991) and *Town of Emerald Isle v. State of N.C.*, 320 N.C. 640, 360 S.E.2d 756 (1987)).

In challenging Asheville's standing, the State cites *In re Appeal of Martin*, 286 N.C. 66, 209 S.E.2d 766 (1974), in which our Supreme Court held that a certain county lacked standing to challenge the constitutionality of a provision contained in a particular statute. However, the Court explained in *Town of Spruce Pine*, *supra*, that its holding in *Martin* was *not* that political subdivisions lack the authority to challenge the constitutionality of a statute *generally*, but rather that a political subdivision which *accepts the benefits* of part of a statute lacks standing to challenge another part of that same statute. *Town of Spruce Pine*, 346 N.C. at 790, 488 S.E.2d at 146 (distinguishing *Martin*). Here, Asheville has standing because it has not accepted any benefit from the 2013 Water/Sewer Act.

IV. Constitutionality of the Water/Sewer Act

The trial court held that the Transfer Provision was invalid under our North Carolina Constitution based on three separate grounds:

(1) the Transfer Provision is a "local law" relating to "health," "sanitation" and "non-navigable streams," in violation of *Article II, Section 24*;

(2) the Transfer Provision violates Asheville's rights under the "law of the land" clause found in *Article I, Section 19*; and

(3) the Transfer Provision constitutes an unlawful taking of Asheville's property without just compensation in violation of *Article I, Sections 19* and *35*.

We disagree and hold that the Transfer Provision does not violate these constitutional provisions.[2]

A. The General Assembly has plenary power regarding the political subdivisions in our State, except as restricted by the state and federal constitutions.

The plenary police power of the State is "vested in and derived from the people," *N.C. Const. Article I, § 2*; and "an act of the people *through their representatives in the legislature* is valid unless prohibited by [the State] Constitution." *State ex rel. Martin v. Preston*, 325 N.C. 438, 448-49, 385 S.E.2d 473, 478 (1989) (emphasis added). *See also Hart v. State*, ___ N.C. ___, ___, 774 S.E.2d 281, 287 (2015) (stating that the North Carolina Constitution "is not a grant of power, but [rather] *a limit* on the otherwise plenary police power of the State"); *Painter v. Wake County Bd. of Educ.*, 288 N.C. 165, 177, 217 S.E.2d 650, 658 (1975) (stating that "[a]n act of our General Assembly is legal when [the North Carolina] Constitution contains no prohibition against it").

---

[2] The trial court refused to rule on a fourth basis in support of the injunction, namely, that the Transfer Provision unlawfully impairs Asheville's contractual obligations with its bondholders who provided financing for its public water system, in violation of *Article I, Section 10* of the United States Constitution; *Article I, Section 19* of the North Carolina Constitution; and N.C. Gen. Stat. § 159-93. However, Asheville has not presented any argument regarding this fourth ground as "an alternative basis in law for supporting the [injunction]," N.C. R. App. P. 10(c), and, therefore, it is not preserved.

The General Assembly's power includes the authority to organize and regulate the powers of our State's municipalities and other political subdivisions. *See N.C. Const. art. VII, §1* (recognizing that the General Assembly has the power to regulate our towns and cities "except as [] prohibited by [our state] Constitution"). Our Supreme Court has repeatedly recognized this power. For example, in two cases in which Asheville was a party, the Court stated that the powers of a municipality "may be changed, modified, diminished, or enlarged [by the General Assembly, only] subject to the constitutional limitations," *Candler v. City of Asheville*, 247 N.C. 398, 407, 101 S.E.2d 470, 477 (1958), and that the authority accorded a municipality "may be withdrawn entirely at the will or pleasure of the [General Assembly]," *Rhodes v. Asheville*, 230 N.C. 134, 140, 52 S.E.2d 371, 376 (1949). *See also In re Ordinance*, 296 N.C. 1, 16-17, 249 S.E.2d 698, 707 (1978) ("Municipalities have no inherent powers; they have only such powers as are delegated to them by [our General Assembly]"); *Highlands v. Hickory*, 202 N.C. 167, 168, 162 S.E. 471, 471 (1932) ("[Municipalities] . . . are the creatures of the legislative will, and are subject to its control").

Here, the General Assembly has sought to exercise its power over political subdivisions by enacting the Transfer Provision, which (1) creates a new political subdivision in Buncombe County (an MWSD), (2) withdraws from Asheville authority to own and operate a public water system, and (3) transfers Asheville's water system to the MWSD, all without Asheville's consent and without compensation to Asheville.

Early last century, our Supreme Court recognized our General Assembly's power to withdraw from the City of Charlotte its authority to operate its public water system and to transfer this system to a new political subdivision:

> It is clear that the Legislature may, in aid of municipal government or for the purpose of discharging any municipal functions, or for any proper purpose, create municipal boards and confer upon them such powers and duties as in its judgment may seem best. . . . The Legislature has frequently exercised the power conferred by the Constitution by establishing boards of health in towns and cities, school boards and such others as may be deemed wise as additional government agencies. *We do not understand that this power is questioned, or that the title to the [public water system] purchased by [Charlotte] did not pass to and vest in the board of water commissioners established by the act [of the Legislature].*

*Brockenbrough v. Board of Water Comm'rs.*, 134 N.C. 1, 17, 46 S.E. 28, 33 (1903). The Court recognized that the waterworks of a municipality are, in fact, "held in trust for the use of the city." *Id.* at 23, 46 S.E. at 35. Additionally:

> There is no prohibition . . . against the creation by the Legislature of every conceivable description of corporate authority and to endow them with all the faculties and attributes of other pre-existing corporate authority. Thus, for example, there is nothing in the Constitution of this State to prevent the Legislature from placing the police department of [a municipality] or its fire department or its waterworks under the control of an authority which may be constituted for such purpose.

*Brockenbrough*, 134 N.C. at 18, 46 S.E. at 33. The Court noted that even the city of Charlotte, the plaintiff in *Brockenbrough*, "conced[ed] the power of the Legislature to

establish [a separate] board of water commissioners and to transfer to the said board the [waterworks] property of the city." *Id.* at 18, 46 S.E. at 33.

Accordingly, *unless prohibited by some provision in the state or federal constitutions*, our General Assembly has the power to create a new political subdivision, to withdraw from Asheville authority to own and operate a public water system, and to transfer Asheville's water system to the new political subdivision.

B. The three constitutional restrictions on the General Assembly's power cited by the trial court do not apply to the enactment of the Transfer Provision.

Asheville argues that the trial court correctly concluded that the Transfer Provision violates our state constitution. In our *de novo* review of the trial court's conclusions, we are guided by the following:

Our courts have the power to declare an act of the General Assembly unconstitutional. *See Hart*, ___ N.C. at ___, 774 S.E.2d at 284; *Bayard v. Singleton*, 1 N.C. 5 (1787).

We must not declare legislation to be unconstitutional unless "the violation is *plain and clear*," *Hart*, ___ N.C. at ___, 774 S.E.2d at 284 (emphasis added). We are to "indulge every presumption in favor of [an act's] constitutionality" and that "all reasonable doubt will be resolved in favor of its validity." *Painter*, 288 N.C. at 177, 217 S.E. at 658.

We are not to be concerned with the "wisdom and expediency" of the legislation, but whether the General Assembly has the "power" to enact it. *In re Denial*, 307 N.C.

52, 57, 296 S.E.2d 281, 284 (1982). As our Court has recognized in an opinion authored by Judge (now Chief Justice) Mark Martin, "courts have no authority to inquire into the *motives* of the [General Assembly] in the incorporation of [a] political subdivision[.]" *Bethania Town v. City of Winston-Salem*, 126 N.C. App. 783, 786, 486 S.E.2d 729, 732 (1997) (emphasis added).

And, finally, the burden in this case rests with Asheville to show beyond a reasonable doubt that the Transfer Provision violates some constitutional provision.

We now address the three constitutional grounds relied upon by the trial court in striking down the Transfer Provision.

*1. Article II, Section 24* – Prohibition against certain types of local laws.

Asheville argues, and the trial court concluded, that the Transfer Provision violates *Article II, Section 24(1)(a)* and *(e)* of our state constitution, which prevents the General Assembly from enacting certain types of local laws. We disagree.

Taking effect in 1917, *Article II, Section 24* restricts the otherwise plenary power of our General Assembly to enact so-called "local" laws, by declaring void any "local" law concerning any of 14 "prohibited subjects" enumerated in that provision. *N.C. Const. art. II, § 24(1)(a)-(n)*. Therefore, a law violates this constitutional provision *only* if it is deemed "local" *and* if it falls within the ambit of one of the 14 "prohibited subjects."

In the present case, the trial court held that the Transfer Provision is a local law and that it falls within the ambit of two "prohibited subjects": Laws "relating to health [or] sanitation" and laws "relating to non-navigable streams[.]" *N.C. Const. art. II, § 24(1)(a), (e).*

Our Supreme Court has stated that a law is either "general" or "local," but there is "no exact rule or formula" which can be universally applied to make the distinction. *Williams v. Blue Cross*, 357 N.C. 170, 183, 581 S.E.2d 415, 425 (2003). However, in the present case, we need not reach whether the Transfer Provision constitutes a "local law." Rather, we hold that it is not *plain and clear* and *beyond reasonable doubt* that the Transfer Provision falls within the ambit of either prohibited subject identified by the trial court.

Seven years ago, our Court grappled with this issue in a case involving these same parties and a constitutional challenge of three statutes regulating the Asheville Water System. *City of Asheville v. State of North Carolina*, 192 N.C. App. 1, 665 S.E.2d 103 (2008).

In the 2008 case, Asheville argued that every law which concerns a water or sewer system "*necessarily* relate[s] to health and sanitation" within the ambit of *Article II, Section 24(1)(a). City of Asheville*, 192 N.C. App. at 32, 665 S.E.2d at 126. Writing for this Court, our former Chief Judge John Martin rejected Asheville's argument, holding that "the mere implication of water or a water system in a

legislative enactment does not necessitate a conclusion that it relates to health and sanitation in violation of the Constitution." *Id.* at 37, 665 S.E.2d at 129.

Rather, we concluded that our Supreme Court precedent instructs that a local law is not deemed to be one "relating to health [or] sanitation" <u>unless</u> (1) the law plainly "state[s] that *its purpose is to regulate* [this prohibited subject]," <u>or</u> (2) the reviewing court is able to determine "that the purpose of the act is to regulate [this prohibited subject after] careful perusal of the entire act". *Id.* at 33, 665 S.E.2d at 126 (quoting *Reed v. Howerton*, 188 N.C. 39, 44, 123 S.E. 479, 481 (1924)). We noted that the best indications of the General Assembly's purpose are "the language of the statute, the spirit of the act, and what the act seeks to accomplish." *City of Asheville*, 192 N.C. App. at 37, 665 S.E.2d at 129 (*quoting State ex rel. Comm'r of Ins. v. Rate Bureau*, 300 N.C. 381, 399, 269 S.E.2d 547, 561 (1980)).

Following *Reed* and our 2008 case, we first look to see if the Water/Sewer Act expressly states that its purpose is to regulate health or sanitation, and conclude that it does not. Rather, the Act's *stated* purpose is to address concerns regarding the quality of the service provided to the customers of public water and sewer systems:

> Whereas, regional water and sewer systems provide reliable, cost-effective, *high-quality* water and sewer *services* to a wide range of residential and institutional customers; and
>
> Whereas, in an effort to ensure that the citizens and businesses of North Carolina are provided with the *highest quality services*, the State recognizes the value of regional

> solutions for public water and sewer for large public
> systems; Now, therefore,
>
> The General Assembly of North Carolina enacts . . . .

2013 N.C. Sess. Laws 50 (emphasis added).

We next peruse the entire Water/Sewer Act to determine whether it is plain and clear that the Act's purpose is to regulate health or sanitation. We find that there are no provisions in the Act which "contemplate[] . . . prioritizing the [Asheville Water System's] health or sanitary condition[.]" *See City of Asheville*, 192 N.C. App. at 36-37, 665 S.E.2d at 128. In fact, a provision in the Act allows for the "denial or discontinuance of [water and sewer] service" by an MWSD based on a customer's non-payment, *see* N.C. Gen. Stat. § 162A-85.13(c), which, as in the 2008 case, belies Asheville's argument that the purpose of the Act relates to health and sanitation. *See City of Asheville*, 192 N.C. App. at 35, 665 S.E.2d at 127. Rather, the provisions in the Water/Sewer Act appear to prioritize concerns regarding the governance over water and sewer systems and the quality of the services rendered. *See* N.C. Gen. Stat. § 162A-85.1, *et seq.*

Following this same analysis, we hold that the Water/Sewer Act does not fall within the ambit of the phrase "relating to non-navigable streams." The mere implication in legislation of a public water system which happens to derive water from a non-navigable stream "does not necessitate a conclusion that [the legislation] relates to [non-navigable streams] in violation of the Constitution." *City of Asheville*,

192 N.C. App. at 37, 665 S.E.2d at 129. There is nothing in the Water/Sewer Act which suggests that its purpose is to address some concern regarding a non-navigable stream.

Asheville cites five cases from our Supreme Court to argue that the Transfer Provision *is* a law "relating to health [or] sanitation," which we now address:

The most compelling of these case is *Drysdale v. Prudden*, 195 N.C. 722, 143 S.E. 530 (1928). *Drysdale* appears to stand for the proposition that an act which establishes a sanitary district (to provide public water/sewer service) is a local law *and* relates to health and sanitation. However, on closer look, the *Drysdale* Court only bases its ruling on the fact that the act is a local law – the Court never makes any determination regarding which of the 14 "prohibited subjects" was implicated by the act; and, therefore we assume that this issue was not put before the Court.

We read *Drysdale* in conjunction with *Reed, supra*. Like *Drysdale*, *Reed* is a 1920's case in which our Supreme Court addresses the constitutionality of a statute creating sanitary districts. *Reed*, 188 N.C. at 42, 123 S.E. at 479-80. However, unlike *Drysdale,* the Court in *Reed* held that the act in question, which (ironically) created sewer districts in Buncombe County, was constitutional. *Id.* at 45, 123 S.E. at 481-82. Specifically, the Court addressed the issue of whether the act was one "relating to health [or] sanitation," holding that *it was not*, because the language in the act did not suggest this to be the act's purpose, but rather the act merely sought to create

political subdivisions through which sanitary sewer service could be provided. *Id.* at 44, 123 S.E. at 481. The Court then addressed *separately* the issue of whether the act was local, though curiously holding that the act was not local because it applied to the entire county. *Id.* at 45, 123 S.E. at 481-82.

In any event, both cases provide insight on the issue as to whether a law is "local" or "general," and, admittedly, the Court's conclusion in *Drysdale* on this issue is more consistent with recent holdings from that Court, while the conclusion on the issue reached in *Reed* – that a law is "general" if it applies throughout one entire county – appears to be somewhat of an outlier. However, *Reed* is more instructive than *Drysdale* in determining whether an act "relat[es] to health [or] sanitation." *Id.* at 44, 123 S.E. at 481. The Court in *Reed* takes this issue head-on, while in *Drysdale* the Court never addresses the issue. Accordingly, as our Court did in 2008, we follow *Reed* on the issue as to whether a law relates to health or sanitation.

The other cases cited by Asheville do not mandate that we reach a contrary result in the present case. Three of these cases are distinguishable because they deal with legislation that empowers a political subdivision with authority *to enforce health regulations* in a county. *See City of New Bern v. Bd. of Educ.*, 338 N.C. 430, 437-38, 450 S.E.2d 735, 739-40 (1994) (authorizing Craven County to perform building inspections); *Idol v. Street*, 233 N.C. 730, 733, 65 S.E.2d 313, 315 (1951) (creating a city-county board of health in Forsyth County); *Sams v. Bd. of County Comm'rs*, 217

N.C. 284, 285, 7 S.E.2d 540, 541 (1940) (creating a county board of health in Madison County). In the present case, however, the Transfer Provision does not empower anyone to enforce health regulations, nor does it impose any health regulations on the Asheville Water System. Rather, similar to the act at issue in *Reed*, it merely creates the political subdivision through which public water and sewer systems may be provided in Buncombe County. *Reed*, 188 N.C. at 44, 123 S.E. at 481.

The fifth case cited by Asheville, *Lamb v. Bd. of Educ.*, is also not controlling. 235 N.C. 377, 70 S.E.2d 201 (1952). In *Lamb*, our Supreme Court declared unconstitutional an act which imposed a duty on the Randolph County Board of Education to provide "a sewerage system and an adequate water supply" for its schools. *Id.* at 379, 70 S.E.2d at 203. The Court held that this legislation *did* relate to health and sanitation because it was clear that "its sole purpose" was to make sure that school children in Randolph County had access to "healthful conditions" while at school. *Id.* The Water/Sewer Act, however, does not require any political subdivision to continue operating a water or sewer system.

*2. Article I, Section 19 – "Law of the Land" Clause/Equal Protection*

Asheville argues, and the trial court concluded, that the Transfer Provision violated the "law of the land" clause contained in *Article I, Section 19* because there is no "rational basis" in treating Asheville differently from other municipalities

operating public water systems and because there is no "rational basis" in transferring Asheville's water system to another political subdivision. We disagree.

The trial court cites *Asbury v. Albemarle*, 162 N.C. 247, 78 S.E. 146 (1913), as authority for its holding. In *Asbury*, our Supreme Court stated that our General Assembly "is under the same constitutional restraints that are placed upon it in respect of private corporations" when exercising power regarding a municipality's exercise of a proprietary function. *Id.* at 253, 78 S.E. at 149. However, we do not read *Asbury* as restricting the General Assembly's authority to *withdraw* authority from a political subdivision to engage in a proprietary function, a power recognized in *Article VII, Section 1* and in a number of other Supreme Court decisions. Rather, *Asbury* addresses the limitations to the General Assembly's power to *manage* certain aspects of a municipality's water system, standing for the propositions that (1) the General Assembly has the authority *to empower* a municipality to operate a public water system (or other proprietary endeavor); (2) the General Assembly, however, cannot *compel* a municipality to operate a water system (or other proprietary endeavor); and (3) where a municipality which has been empowered *and* has decided to operate a public water system, the General Assembly may regulate but cannot otherwise "control the exercise of [] discretion by the municipality" in operating the system. *Id.* at 255, 78 S.E. at 150.

Our holding here is not at odds with *Asbury*. The Transfer Provision does not *compel* Asheville to operate a water system nor does it seek to interfere with Asheville's *discretion* in running a water system. Rather, the General Assembly is exercising its power to *withdraw* from Asheville its authority to own and operate a public water system. *See Candler*, 247 N.C. at 407, 101 S.E.2d at 477 (recognizing the General Assembly's power to "diminish" the powers of a municipality).

Asheville contends, and the trial court agreed, that the General Assembly had no "rational" basis for *singling out* Asheville in the Transfer Provision. Assuming that the Transfer Provision has this effect, we believe that the fact that the General Assembly irrationally singles out one municipality in legislation merely means that the legislation is a "local" law; it does not render the legislation unconstitutional, *per se*. *See City of New Bern v. New Bern-Craven County Bd. of Educ.*, 338 N.C. 430, 435-36, 450 S.E.2d 735, 738-39 (holding that a law is local if there is no "rational basis reasonably related to the objective of the legislation" for singling out the class to whom the law applies); *McIntyre v. Clarkson*, 254 N.C. 510, 519, 119 S.E.2d 888, 894 (1961) (establishing the "reasonable classification" method to determine whether a law is general or local). As previously noted, the General Assembly can enact a local law concerning municipalities so long as the law does not fall within one of the 14 prohibited subjects enumerated in *Article II, Section 24* of our state constitution. *See City of Asheville*, 192 N.C. App. at 32, 665 S.E.2d at 126 (sustaining statutes

regulating the Asheville Water System though concluding that the singling out of Asheville was not based on any rational basis).

We are persuaded by decisions from the United States Supreme Court holding that municipalities do not have Fourteenth Amendment rights concerning acts of the legislature, *Ysursa v. Pocatello Educ. Assoc.*, 555 U.S. 353, 363 (2009) (holding that unlike a private corporation, a municipality "has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator [the legislature]"), a rule which applies even when legislation affects a municipality's exercise of a proprietary function, such as operating a water system. *See Trenton v. New Jersey*, 262 U.S. 182, 190-91, 67 L. Ed. 937, 942 (1923) (holding that the distinction between a municipality acting "as an agent for the State for governmental purposes and as an organization to care for the local needs in a private or proprietary capacity . . . furnishes no ground to invoke [the Fourteenth Amendment of the United States]"); *see also Williams v. Baltimore*, 289 U.S. 36, 40, 77 L. Ed. 1015, 1020-21 (1933); *Rogers v. Brockette*, 588 F.2d 1057, 1067-68 (1979) (citing additional United States Supreme Court authority).

Finally, the trial court concludes that the Transfer Provision violates the "law of the land" clause because there is no rational basis between the purpose of the Act (to ensure that citizens and businesses are provided with the highest quality of services) and requiring the involuntary transfer of the Asheville Water System to an

MWSD. The trial court lists reasons why it believes that the Transfer Provision will not accomplish a legitimate purpose. However, the State suggests a number of rational bases for the Transfer Provision. For instance, the Transfer Provision was included to provide better governance of the Asheville Water System, a system which has had a contentious history with customers residing outside Asheville's city limits: The Transfer Provision allows the Asheville Water System to be governed by a political subdivision whose representatives are selected from all areas served by the System, as opposed to being governed by Asheville's city council, which is chosen only by those living within Asheville's city limits. It is not our role to second-guess "the wisdom [or] expediency" of the Transfer Provision, as long as there is some rational basis in that provision to accomplish some valid public purpose. *See In re Denial*, 307 N.C at 57, 296 S.E.2d at 284.

Accordingly, we reverse the conclusion of the trial court that the Transfer Provision violates the "law of the land" clause in our state constitution.

*3. Article I, Sections 19 and 35 – Taking of Asheville's Property*

Asheville argues, and the trial court held, that the Transfer Provision exceeded the State's authority to take property, or, in the alternative, to take property without paying just compensation in violation of *Article I, Sections 19* and *35* of our state constitution. We disagree.

- 20 -

*Article I, Section 19* of our state constitution states that no person shall be "deprived of . . . property, but by the law of the land," and *Article I, Section 35* states that "[a] frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty."

The trial court concluded that the Transfer Provision violates the above cited sections in two respects: <u>First</u>, the Transfer Provision was "not a valid exercise of the sovereign power of the [General Assembly] to take or condemn property for a public use" because the transfer of Asheville's water system to the MSD would not result in any "change in the existing uses or purposes currently served by the [system]"; and <u>second</u>, even if the General Assembly had the power to "condemn" Asheville's water system, it deprived Asheville of its constitutional right to receive "just compensation."

On the first issue, we note that our Supreme Court has recognized the authority of our General Assembly to divest a city of its authority to operate a public water system and transfer the authority and assets thereof to a different political subdivision. *See Brockenbrough*, 134 N.C. at 19, 46 S.E. at 33 (recognizing that the waterworks of a municipality are, in fact, held "in trust for the use of the city").

Our United States Supreme Court has held that there is no constitutional prohibition against a State withdrawing from a municipality the authority to own and operate a public water system and transferring the municipality's system to

another political subdivision "without compensation" to the municipality or "without

the consent" of the municipality's citizens:

> The diversion of waters from the sources of supply for the use of the inhabitants of the State is a proper and legitimate function of the State. This function . . . may be performed directly [by the State]; or it may be delegated to bodies politic created for that purpose, or to the municipalities of the State. . . .
>
> . . . . The State, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies. . . . All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest.

*Trenton v. New Jersey*, 262 U.S. at 186, 67 L. Ed. at 940. *See also Hunter v.*

*Pittsburgh*, 207 U.S. 161, 178-79, 52 L. Ed. 151, 159-60 (1907). The *Trenton* Court

specifically addressed that its holding applied even to State action concerning a

municipality acting in a proprietary capacity. *Trenton*, 262 U.S. at 191, 67 L.E. at

943.

Our holding today is consistent with holdings from around the United States.

As the treatise *McQuillan on Municipal Corporations* recognizes, "it is generally held

that transferring property and authority by act of the legislature from [a city] to

another where the property is still devoted to its original purpose, does not invade

the vested rights of the city." *McQuillan*, sec. 4.133, Vol. 2. Indeed, the Minnesota

Supreme Court has stated:

> "[a]s to property held in a proprietary or private capacity, in trust for the benefit of township inhabitants for certain designated purposes, the legislature may provide for the transfer thereof from the officers of such municipality to different trustees, with or without consent of the municipality and without compensation to it.

*Bridgie v. Koochiching*, 35 N.W.2d 537, 540 (1948). Likewise, the Pennsylvania Supreme Court has stated:

> The Commonwealth has absolute control over such agencies and may add to or subtract from the duties to be performed by them, or may abolish them and take property with which the duties were performed without compensating the agency thereof.

*Chester County v. Commonwealth*, 17 A.2d 212, 216 (1941). *See also Orleans Parish v. New Orleans*, 56 So.2d 280, 284; *Hickey v. Burke*, 69 N.E.2d 33 (1946) (Ohio court recognizing power to "relieve [a] municipality of [certain] duties and withdraw the power. If property has been acquired, it may shift the title and control to other agencies[.] . . . without compensation").

None of the cases cited by Asheville in its argument address the situation where the General Assembly acts to take the property of a municipality used to carry on a proprietary function and transfers it to another political subdivision to carry out the same function. For instance, *State Hwy. Comm'n v. Greensboro Bd. of Educ.,* 265 N.C. 35, 143 S.E.2d 87 (1965) and *Bd. of Transp. v. Charlotte Park & Rec. Comm'n*, 38 N.C. App. 708, 248 S.E.2d 909 (1978) merely stand for the proposition that where one governmental agency charged with building roads condemns the property of

another agency who owns property for purposes unrelated to building roads, the condemning agency must pay just compensation.

Accordingly, we hold that the Transfer Provision does not constitute an unlawful taking without just compensation.

## V. Conclusion

In conclusion:

We affirm the portion of the trial court's order denying the State's motion to dismiss, rejecting the State's argument that Asheville lacked standing or capacity to challenge the validity of the Transfer Provision.

We reverse the trial court's grant of summary judgment for Asheville on its first claim for relief, which declared that the Transfer Provision constitutes a local act relating to health, sanitation or non-navigable streams in violation of *Article II, Sections 24(1)(a)* and *(e)* of our state constitution. Specifically, we hold that, assuming it is a local act, it does not "relate to" health, sanitation, or non-navigable streams within the meaning of our state constitution. We also reverse the trial court's denial of the State's motion for summary judgment on this claim, and direct the court on remand to enter summary judgment in favor of the State on this claim.

We reverse the trial court's grant of summary judgment for Asheville on its second claim for relief, which declared that the Transfer Provision violates the "law of the land" clause in *Article I, Section 19* of our state constitution. We also reverse

the trial court's denial of the State's motion for summary judgment on this claim, and direct the court on remand to enter summary judgment in favor of the State on this claim.

We reverse the trial court's grant of summary judgment for Asheville on its third claim for relief, which declared that the Transfer Provision violates *Article I, Sections 19* and *35* of our state constitution, as an invalid exercise of power to take or condemn property. We also reverse the trial court's grant of summary judgment on Asheville's sixth claim for relief, which, in the alternative to the injunction, awarded Asheville money damages for the taking of the Asheville Water System. We also reverse the trial court's denial of the State's motion for summary judgment on these claims, and direct the court on remand to enter summary judgment in favor of the State on these claims.

We reverse the trial court's order enjoining the enforcement of the Transfer Provision.

We do not reach any conclusion regarding Asheville's fourth and fifth claims for relief, in which Asheville contends that the enforcement of the Transfer Provision would impermissibly impair obligations of contract in violation of our state and federal constitutions and in violation of N.C. Gen. Stat. § 159-93. The trial court made no rulings on these claims, and Asheville did not take advantage of Rule 10(c) of our Rules of Appellate Procedure, which allows an appellee to propose issues which

form "an alternate basis in law for supporting the order[.]"  Therefore, any argument

by Asheville based on these claims for relief are waived.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

Judges CALABRIA and ELMORE concur.